ALMEDA MALL, INC. and Northwest Mall, Inc., Plaintiffs-Appellants, Cross-Appellees,

v.

HOUSTON LIGHTING & POWER CO., Defendant-Appellee, Cross-Appellant.

WESTWOOD MALL, INC., a Maryland Corporation, Plaintiff-Appellant, Cross-Appellee,

v.

HOUSTON LIGHTING & POWER CO., a Texas Corporation, Defendant-Appellee.

No. 78–1586.

United States Court of Appeals, Fifth Circuit.

April 11, 1980.

Lewis A. Noonberg, Paul V. Niemeyer, Baltimore, Md., Richard R. Goldberg, Richard G. McCauley, Columbia, Md., for plaintiffs-appellants, cross-appellees.

Baker & Botts, Walter E. Workman, David P. Cotellesse, C. Henry Kollenberg, Houston, Tex., for defendant-appellee, cross-appellant.

Before COLEMAN, Chief Judge, REAVLEY and ANDERSON, Circuit Judges.

COLEMAN, Chief Judge.

In this antitrust action the plaintiff Malls charge that Power Company refusal to sell them electricity through a single meter for individual resale to their business tenants is a violation of the federal antitrust laws and is discriminatory under Texas state law.

The lengthy record presents novel issues. The Malls do not generate or transmit or distribute electric power generally, and they have no intention of doing so. They simply wish to have the Power Company deliver electric power to them at a single meter, after which they would sell it to their respective tenants at the same retail rates now charged by the Utility.

The District Court granted a directed verdict in favor of the Power Company on all issues. We affirm.

I.

The plaintiff-appellants are developers and owners of three regional shopping malls, Almeda Mall, Inc., Northwest Mall, Inc., and Westwood Mall, Inc., in Houston, Texas. The defendant-appellee, Houston Lighting & Power Company (HL & P), is a privately owned electric utility company, operating under a nonexclusive franchise granted by the City of Houston.

### The Regulatory Framework

HL & P operates under a nonexclusive franchise granted initially by the City of Houston late in the nineteenth century and last renewed in 1957. The franchise is nonexclusive because Texas does not authorize a utility to have any type of exclusive monopoly.[1] The City of Houston is empowered to franchise additional electric utilities at any time. The HL & P franchise stipulates that under certain circumstances the City may purchase HL & P's facilities and operate the utility. Despite these options, HL & P is the only franchised electric utility in the City of Houston and the surrounding area. Consequently, HL & P is presently a natural monopoly for the distribution of electric power.

---

1. Tex.Const. art. I, § 26; Tex.Rev.Civ.Stat.Ann. art. 7428a. *See Lea County Electric Cooperative, Inc. v. City of Plains,* 373 S.W.2d 90 (Tex. Civ.App.1963).

When this suit was filed, Texas had no regulatory commission to oversee public utility activity. Texas relied on local municipalities to regulate utilities as allowed under state law.[2] In 1975, Texas enacted a Public Utility Regulatory Act (PURA) and created a statewide Public Utilities Commission. Under PURA, however, municipalities retained their regulatory power under the same standards and rules applicable to the new commission.[3]

Within this framework, state law and the nonexclusive franchise give the City of Houston the power to regulate practically all operations of HL & P regarding rates, operating procedures, and services to customers. The fact that the City can and does regulate HL & P actively is strongly supported by the record.[4]

### Rate Structure

HL & P operates with 23 rate schedules, distinguished by the *type* and *quantity* of electric service rendered. Four of the schedules have been formally adopted by the City of Houston by rate ordinances, including (1) RS–1, residential service; (2) MGS–1, miscellaneous general service for loads not in excess of 50 kilovolt amperes; (3) H–7, small direct current usage for motors and other electrical equipment with a connected load of less than 100 horsepower; and (4) MSL, municipal street lighting. The remaining 19 schedules are not formalized by City ordinance but are submitted to the City as tariffs, automatically taking effect within a prescribed period of time. These rates are, however, at all times subject to the control and regulations of the City and can, in fact, be adopted by City ordinance.

The rate schedules applicable in this case are HL & P's general service rates: (1) MGS, for a demand up to 50 kilovolt amperes (the same as MGS–1 adopted by ordinance for city classification purposes); MGS–1L, for a demand above 50 kilovolt amperes; and LGS, for a demand above 700 kilovolt amperes with certain usage. These scheduled rates vary according to the level of demand and use. Because of the volume of electricity consumed, the LGS rate costs less than the MGS or MGS–1L rates.

### Resale Practices

For many years, it has been HL & P's policy, and practice, not to allow the resale of electricity. All rate schedules used by HL & P, whether effected by ordinance or not, specifically state that resale is prohibited. Under the MGS City ordinance, however, a special contract may be allowed

---

2. Control of utilities by municipalities was provided by Tex.Rev.Civ.Stat.Ann. art. 1119, which was repealed in 1975 with the passage of the Public Utility Regulatory Act (PURA), and by Tex.Rev.Civ.Stat.Ann. art. 1175(12) which provides in part that municipalities can

> . . . determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy the franchise or exercising any other public privilege in said city and to prescribe the kind of service to be furnished by such person, firm or corporation, and the manner in which it shall be rendered, and from time to time alter or change such rules, regulations and compensation . . . . .

3. PURA, Tex.Rev.Civ.Stat.Ann. art. 1446c, Section 17(a) provides

> Sec. 17. (a) Subject to the limitations imposed in this Act, and for the purpose of regulating rates and services so that such rates may be fair, just, and reasonable, and the services adequate and efficient, the governing body of each municipality shall have exclusive original jurisdiction over all electric, water, and sewer utility rates, operations, and services provided by an electric, water, and sewer utility within its city or town limits.

4. The record clearly indicates that HL & P is continuously regulated by the City. In 1959, the City prohibited HL & P from using residential demand meters. In 1960, HL & P applied for a rate increase which resulted in hearings lasting over a year and ended with the City Council fixing the rate of return on all classes of service. In 1966, the Public Service Department recommended to the City that HL & P earnings were too high and HL & P was required to lower all of its rates. In 1970, following application and investigation, new rates were enacted and approved by the City for HL & P earnings.

permitting resale of power along with other commonly prohibited services.[5]

Trial testimony revealed several reasons for restricting resale of electricity by HL & P. One is that direct service by the utility to the customer eliminates intrusion by an unregulated middleman and prevents possible conflicts over duties to maintain and repair the electrical system.[6] Another reason, offered by Dr. Paul Garfield, a public utility economist, states that insulation of different market prices to different classes of customers is necessary to maintain the entire public utility rate structure and to spread costs of service equitably to each class of customers.[7] Restrictions on resale,

5. The MGS ordinance reads in part:

> (2) This schedule shall not be available for loads in excess of 50 kva, temporary, breakdown, stand-by, supplementary or resale service, except upon special contract.

HL & P defines the "special contract" exception as follows:

> The "special contract" exception has been interpreted, with the concurrence of the Public Service Department of the City, to be limited to those situations where it is not feasible for the Company to furnish service direct to the users of such service.

6. On direct examination, Mr. Tom Tyson, Public Service Director, testified as follows about the provisions in rate schedules against resale:

Q. From the standpoint of regulating the company, is that provision of some importance, or not?

A. Of great importance.

Q. And could you describe for us what the significance or what the importance of that provision is?

A. It's in the public interest that the utilities serve the customers directly, and from the regulatory viewpoint it is very important that the regulatory agency have jurisdiction over the entity that is providing the service. And for those two primary reasons, the city policy is not to permit resale of electric utility services in the city.

Q. What's so bad about resale, Mr. Tyson?

A. Several—several things are bad about it. One, the city would have no control over the party that is doing the reselling, of his rates, of the service he provides. And when people have a complaint about the service, they normally call the utility or the city. When you have a situation where you do have someone reselling service, you have a problem of determining who is at fault, and if there is a problem you have difficulty in obtaining the solution to the problem. I'm talking about rates and service now.

And the city has had some experiences over the years, not so much from resale but from other instances where there was another party involved between the utility that was providing the service and the customer that was actually receiving the service.

(T. 1383–85).

7. Dr. Garfield testified in the trial outside the presence of the jury because of the District Court judge's order *in limine* concerning evidence of impact on ratepayers. Dr. Garfield testified on direct examination:

Q. Now, are provisions such as the one at stake in this case, where it says the rates are not available for resale, are these types of provisions in rates normally and customarily accepted by regulatory authorities?

A. Yes. They were accepted a long time ago. Issues as to resale prohibitions just don't arise. I think this is the first one I have encountered, and I have been at work in this area for twenty-eight or twenty-nine years.

Q. Could you explain to the Court what the purpose of these types of rate provisions is, that is, prohibition against resale?

A. Yes, sir. First of all, the regulators want the utility companies to earn the revenues that they are supposed to earn from each market sector. That is, when regulatory decisions are made as to how much revenue is supposed to be produced from each market sector, or from each rate schedule, they expect that to take place. The resale ban amounts, in effect, to insulation as between the market sectors so that a customer can't buy from the light company and turn right around and sell to another customer of the light company.

In other words, the resale prohibition is there to create orderliness in the regulatory process, so that when a regulatory decision is made which says the utility company will earn a certain portion of its revenues from a certain market sector, that expectation is supposed to be realized. And it can't be realized with any certainty if the customers can start doing business with one another.

Which leads me to my second point, in answer to your question: Public policy is very clear in desiring what ultimate consumers of utility service be served by regulated public utilities, by regulated public utilities who are responding to public officials with the power to tell those utilities what to do, if those in official positions don't like what the utilities are doing.

Q. At least insofar as the utility's ability to earn money, is it fair to say that the resale

therefore, provide stability in the operation and upkeep of utility service.

As a public utility, HL & P is required to serve all similar customers in a like manner. Certain groups of customers, however, have had the rate structure and the right to resell power applied differently in an historical context. Regarding this variation, HL & P admits that, for redistribution to individual tenants, office buildings are served by one meter. However, retail establishments in office buildings, with the exception of businesses located in older buildings in downtown Houston, are individually metered. With the establishment of resale restrictions aimed at individual businesses, old businesses were permitted to continue operating without suffering an expensive conversion to an individual meter.

Apartment complexes in Houston are also permitted to resell power to individual tenants. Under a city ordinance, landlords may opt to have a single meter for an entire apartment complex or may have each individual tenant have a single meter. HL & P has always permitted the customer to take the service providing the most favorable rate application.

All shopping centers in Houston have been served by individual meters for each retail store. This has been in keeping with HL & P's modern policy to meter every retail store separately and not to allow resale from a master meter to individual stores. All applications from shopping centers for resale service in the past have been uniformly declined by HL & P.

### Alleged Violations

Planning and development began in 1967 and 1968 for Almeda Mall and Northwest Mall. During 1967, the Malls inquired of HL & P about the possibility of purchasing electricity through a limited number of meters so that they could redistribute and resell the electricity to the individual tenants of the Malls. Under this proposed plan the Malls would receive electricity at the cheaper LGS rate, since the kilovolt demand at each meter would far exceed the required 700 kva minimum. They would then resell to the tenants through individual meters at the higher MGS rate, thus realizing a profit. The Malls planned to include the cost of the electricity in the rent charged each tenant on a per square foot basis. HL & P informed the Malls that its policy did not permit the resale of electric power by retail purchasers.

In 1972, Almeda and Northwest Malls formally requested to convert the individually metered stores in their malls to a single meter system convenient for resale. This was refused by HL & P regarding resale to tenants. HL & P did indicate, however, that a single meter could be set up for consumption in office space, storage areas, and common areas within the Malls.

Planning and development for Westwood Mall began in 1973. Westwood requested a limited meter system to enable it to resell electricity to its tenants. HL & P also denied this request.

### The Litigation

Following these denials, Almeda and Northwest Malls and Westwood Mall

prohibition, such as that which is at stake in this case, is designed to insure that the utility will earn from each class of rate that money which that rate is designed to produce for the utility?

A. Yes, this was the first of the two points that I was explaining when I made reference to orderliness in the control of the utility's operations by the regulators.
But that first point is integral with the second point I was developing, which was that public policy abhors utility service being rendered by an unregulated supplier. And the two are not separable. If the customers can turn around and resell, since they are not public utilities, a customer of a utility who resells to yet another customer is an unregulated seller, and this is against public policy.

Q. It is is accurate to say, then, that provisions such as this one, that say the rate is not available for resale service, is it accurate that they are an integral part of the rate structure?

A. Absolutely. The resale provision is just as integral a part of the total offering to serve as are the pricing provisions. These are not severable or separable, they are integral.

brought separate suits against HL & P, alleging that HL & P's denial of resale violated federal antitrust laws, specifically Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, seeking damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. The separate actions were consolidated for trial, with jurisdiction based on Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, 26.

The Malls contend that the utility has denied them the right to compete with it in the retail sale of electricity to their tenants. They also allege that this denial has injured competition between them and other regional shopping centers in the Houston area.

The prohibition against sale for resale, appellants argue, has a detrimental effect on competition in several respects. One argument is that the purchase of electricity by appellants at the LGS rate for resale to tenants would produce not only a profit for the Malls but also a savings to the individual consumers. By purchasing through one, two, or four meters, instead of numerous individual meters, the electrical expenses for an entire mall would be reduced by eliminating the higher charge for initial uses on each meter. A second savings would occur by purchasing power under the LGS rate as opposed to the MGS rate usually necessary for individual meters. While the Malls admit that the design and installation of their own distribution systems would create a substantial initial capital expense, they contend that in the long run they would still realize savings to the tenants and an additional profit for themselves.

*The mall owners admit that they have intended to charge their tenants the same rate that would be charged by HL & P on the retail level.* This is where they would make a profit.

However, the mall owners explain that the individual tenants would realize savings through the lower rate passed on to them as to mall common areas, parking lots, and heating, ventilating and air conditioning systems, expenses presently borne by the tenants through a common area charge made to them.

Another argument is that the mall owners' plan would afford a more reliable and efficient distribution system. This system, they say, would provide better circuitry, safety, and prevention of power failures. Additionally, peak load monitoring devices would be utilized which could reduce overall electrical charges for all occupants when demand became especially high.

A *second* area of competitive injury alleged by the appellant Malls relates to their ability to compete with other regional malls for tenants. Due to the refusal to allow resale, the Malls contend they were unable to sign up tenants as quickly as a more attractive shopping mall package of services might have brought. This was heightened when compared to the competitive market existing from well established shopping centers.

As a result of these strictures on their operations, the appellant Malls view HL & P's actions as inhibitions on their chance to provide the tenant consumers better service—in effect, competitive service. Their specific antitrust claims charge that HL & P's practice is a *per se* violation of Section 1 of the Sherman Act, which prohibits an unreasonable restraint of trade, and is a violation of Section 2 of the Sherman Act, which prohibits possession and maintenance of monopoly power. Appellants assert they have suffered damages to be measured by the amount of money they would have saved through resale, minus the cost of investment made in their own distribution system.[8] They further seek injunctive re-

8. Damages calculated by the appellants were computed by taking the gross dollars which each appellant mall would have received for resale of electricity and subtracting from this gross figure the cost of electricity they would have paid under the LGS rate and the cost of investment in the distribution system designed by each mall. The yielded result would produce the net profit lost by each mall. Estimated computations showed that Almeda Mall lost between $764,680.02 and $789,907.65 in profits, depending on the approach taken in certain

lief that would allow resale practices to their shopping mall tenants in the future.

## II.

◼ Appellants' antitrust allegations of monopolization and restraint of trade are unique in nature.[9] As a general rule; competition is not regarded as feasible at the retail or distribution level in the electric power industry.[10] Nevertheless, federal antitrust laws are applicable to electrical utilities. *Cantor v. The Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

◼ In order to establish a violation under Section 1 of the Sherman Act[11] the appellants must show that a conspiracy, contract or combination exists and that such conspiracy, contract or combination unreasonably restrains trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186 (5th Cir. 1978).

In applying Section 1 to antitrust violations, in some cases the courts have recognized a *per se* violation and in others have applied the "rule of reason" standard. In *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Supreme Court overruled the application of the *per se* rule as was done in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) to vertical restrictions imposed in an economic market.

It was held that:

particular applications of vertical restrictions might justify *per se* prohibition under *Northern Pac. R. Co.* But we do make clear that departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing.

In sum, we conclude that the appropriate decision is to return to the rule of reason that governed vertical restrictions prior to *Schwinn*. When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act.

433 U.S. at 58–59, 97 S.Ct. at 2562.

In doing this, the Court reaffirmed that the appropriate standard for determining whether a *per se* violation of Section 1

---

calculations. The damage figures for Northwest Mall ranged between $807,092.95 and $991,303.78 and the figures for Westwood Mall between $529,109.51 and $1,448,463.35.

9. At the outset of this discussion of legal issues, we note that the appellee HL & P filed a cross-appeal on the issues of (1) immunity from application of the antitrust laws based upon "state action" and (2) "primary jurisdiction." The District Court found for the appellants on these issues and relied on *Cantor v. The Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), and *Litton Systems, Inc. v. Southwestern Bell Tel. Co.*, 539 F.2d 418 (5th Cir. 1976). We agree with the reasoning of the District Court on these issues and find no reason to discuss them here since we hold for the appellee HL & P on the main issue presented concerning application of the antitrust laws.

10. Commentators point out that retail competition is not usually applicable in antitrust law. *See* Meeks, *Concentration in the Electric Power Industry: The Impact of Antitrust Policy*, 72 Colum.L.Rev. 64, 94 (1972). The author notes that competitive distribution processes within the electric power industry usually lead to duplicate facilities that increase cost and waste. He concludes, "competition in the usual sense at the distribution level is generally out of the question." Shenefield, *Antitrust Policy Within the Electric Utility Industry*, 16 Antitrust Bull. 681, 684 n. 8 (1971). The author comments on the resale of electric power at the *wholesale* level and notes:

The Antitrust Division of the Department of Justice and the electric utility industry have traditionally viewed the subject of retail sales as being by and large withheld from the operation of the antitrust laws as they may affect intra-industry relationships.

11. 15 U.S.C. § 1 states in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

existed was that standard set forth in *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958):

[t]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

356 U.S. at 5, 78 S.Ct. at 518.

■ What it comes down to is that all facets and circumstances of a case must be weighed in arriving at a decision whether a particular restrictive practice is prohibited as imposing an unreasonable restraint on competition. *Sylvania, supra* 433 U.S. at 49, 97 S.Ct. at 2557.[12]

■ To establish a monopoly violation under Section 2 of the Sherman Act[13] a complainant must prove two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

Monopoly power has been defined as "the power to control prices or exclude competition" and the existence of such power *ordinarily* may be inferred from a predominant share of the relevant market. *Grinnell, supra* 384 U.S. at 571, 86 S.Ct. at 1704.

■ In this Circuit to succeed with a private antitrust action alleging an unreasonable restraint of trade, one must show more than a violation of antitrust law and damage to himself. He must show that the alleged unreasonable restraint tends to, or is reasonably calculated to, prejudice the *public interest. Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690 (5th Cir. 1975), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Rogers v. Douglas Tobacco Bd. of Trade, Inc.*, 266 F.2d 636 (5th Cir. 1959), *cert. denied*, 361 U.S. 833, 80 S.Ct. 85, 4 L.Ed.2d 75 (1959).

This rule may be avoided, however, if the private action alleges a *per se* violation or is based upon both restraint of trade *and* monopolization actions. In such instances, injury to the public interest and competition is inherent in the charges.

Regarding an unreasonable restraint of trade under Section 1, appellants contend that an absolute restriction on resale is the exact type of monopolistic manipulation sought to be prevented. They assert that this practice impedes intrabrand competition while not at the same time stimulating interbrand competition, which does not exist in the Houston area.[14] This practice is

12. As *Sylvania* points out in a footnote, a frequently cited proper analysis of the "rule of reason" is that of Mr. Justice Brandeis in *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

13. 15 U.S.C. § 2 states in part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . .

14. Interbrand competition is the competition found among the manufacturers of the same generic product and is the primary concern of

352

further exacerbated, it is argued, by the discriminatory practices prevalent in resales to landlords and office buildings. Regarding possession of monopoly power and the willful acquisition or maintenance of that power under Section 2, appellants point out that HL & P holds a solid monopoly position in the relevant market.[15] They add to this the fact that HL & P actively maintains its monopoly and exerts full control over prices and competition since it is the only source of power supply in the market. The policy against resale is equated with willful maintenance of the monopoly in excluding competitive sales and resulting profits for the appellants. To support their Section 2 contentions, appellants rely heavily on the analogy they draw between the present case and the Supreme Court decision in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

*Otter Tail* was a case in which the Otter Tail Power Company refused to sell at wholesale or to wheel[16] electric power to certain municipal power systems, the effect of which was to foreclose competition from prospective or existing municipal systems and to preserve the retail sale of power for Otter Tail. The Supreme Court held this to

be a clear violation of the Sherman Act and an abuse of monopoly power. Actions taken by Otter Tail to preserve its economic position were not justifiable in light of the resultant anticompetitive impact.[17]

In *Otter Tail*, however, the municipal power systems were independent distribution systems capable of competing with the Otter Tail utility. Competition clearly existed for the total retail market of entire municipalities, which could opt for service from Otter Tail or from the municipal system. The refusal by Otter Tail to sell electric power at wholesale or to transfer power, therefore, removed the option of choosing the desired power system.

■ Such an option does not exist here, however, because HL & P is the only electric utility supplying power to the Houston area. Other utilities could enter and compete and be granted a franchise by the City of Houston. The fact is that none have chosen to do so.

. Moreover, *Otter Tail* involved the *wholesale* sale of power (as opposed to retail sale) and also involved the transmission of power from other utilities. In the present case, HL & P is in a position similar to the

antitrust law. Intrabrand competition is the competition between distributors of the product of a manufacturer, whether it be at wholesale or retail level. Even though the two competitions may operate independent of each other, it is possible with a market involving vertical restrictions for a reduction in intrabrand competition to stimulate interbrand competition. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. at 51–52, 97 S.Ct. at 2558.

Since HL & P holds a natural monopoly in the Houston area as the only provider of electric power, interbrand competition does not exist. The appellants assert, therefore, that intrabrand competition in the form of retail resale of power has been hindered without any counterbalancing increase in interbrand competition which could justify HL & P's restriction against resale. This assertion assumes, naturally, that vertical restraints on competition are being exercised by HL & P and that resale is intrabrand competition.

**15.** The appellants point out that the relevant market might be identified as one of three possible service areas: (1) the retail sale of electric power in the entire service area of HL & P, (2) the area covering merely the City of Houston,

or (3) the competitive market area surrounding each of the appellant malls. They assert that, regardless of the area designated as the relevant market, HL & P actively maintains a monopoly over the sale of electric power in it.

**16.** "Wheeling" electric power refers to transfer by direct transmission or displacement electric power from one utility to another over the facilities of an intermediate utility. The Otter Tail Power Company not only refused to sell power directly to municipal power systems at a wholesale price but also refused to let the municipalities receive electric power from other utilities via transfer over their facilities. *See Otter Tail Power Co. v. United States*, 410 U.S. at 368, 93 S.Ct. at 1025.

**17.** *See* Watson and Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards*, 22 Antitrust Bull. 559, 563–65 (1977), criticizing *Otter Tail* for failing to examine precisely the application of conventional monopolization principles to regulated industries with natural monopoly characteristics.

municipal power utilities in *Otter Tail except that it generates its own electrical power.* It has not refused to sell power at wholesale to a competing distribution system and it has not refused to transfer and supply power in such a situation. A refusal to sell power at wholesale so as to prevent another system from selling at a different, competitive retail rate is one thing; selling power at retail and refusing to allow the purchaser to resell at the same retail price is a different matter. *In the latter situation there is no competition.*

In the present case, the Malls generate no electricity. They transmit none. They do not desire to distribute electricity except on their own property and then only at a price no different to that charged by the utility, regulated by the City. What the Malls wish to do is to pre-empt the utility's business for their own profit, not as true competitors for the same market.

We hold that appellants have proven no antitrust violation and no antitrust injury.

The trial court noted, and we agree, that the activity sought by the appellants is more akin to mere "substitution" than to competition. By achieving the goal to resell electricity on the retail level, appellants will be merely plugging themselves into the flow of electricity and reaping profits as a non-competitive middleman.

Appellants argue that from a common meter they will pass along some forms of public benefit such as lower costs for maintaining mall common areas, but the utility has offered to do this. The claim that the Malls would maintain more efficient and reliable distribution systems hardly rises above the speculative. The expert testifying for appellants presented a distribution system not specifically recommended for nor approved by the appellants. The benefit to be derived from such system was weakly based.[18]

The record is clear that HL & P is the sole supplier of electric power in the Houston area. Historically there has been no real competition at any level of service— wholesale, retail, or otherwise. The electricity that the various tenants receive, therefore, will come from HL & P, whether directly from individual meters or indirectly from resale provided by the appellants. The price would be the same. It is hard to see how the consumer tenant would have realized any material advantage. Furthermore, while the appellants argue that resale would give the tenants an option for service, we note that they intended to resell to all tenants under a lease agreement that included in it the cost of electric power. No voluntary choice of electric service was planned by the appellants. The mall tenants would have to buy their power at retail from the appellants.

As to competition with other malls, that is where the competition is, not with the public utility which is being sued in this case.

The appellants additionally have failed to prove any type of "antitrust injury" which could justify an award of damages under Section 4 of the Clayton Act. In order to recover damages under Section 4, appellants must prove in addition to a traditional antitrust violation

> *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause." (Citation omitted.)

> *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

---

**18.** The appellants had Mr. Irving Schwartz, a consulting electrical engineer, testify concerning the economic advantages of a single meter system. His main testimony related to recoverable monetary damages based on savings in using a single meter system under the cheaper LGS rate. His evidence did touch on the design of his system but this was not specifically compared with the system used by HL & P regarding efficiency and reliability. The plan proposed by Mr. Schwartz was designed a month prior to trial for comparison purposes.

Here the appellants fail to meet this standard. A showing of lost profits to the appellants is insufficient by itself to establish a compensable injury under the antitrust laws since there is no parallel injury to competition. The antitrust laws were not intended to prevent the type of activity undertaken by HL & P in the present case concerning resale of electric power. The antitrust laws were designed to protect *competition* and not necessarily *competitors*. *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The rationale outlined in *Brunswick* is fully applicable to the present case and necessitates a finding that antitrust damages are not recoverable by the appellants.[19]

■ We add that, based upon the present facts, there would be great difficulty in proving violations of Sections 1 and 2 in the event some form of competition did exist between the Malls and HL & P. The restrictive activity regarding resale by HL & P does not project the "pernicious effect on competition and lack of any redeeming virtue" standard necessary to establish a *per se* violation of Section 1. It is also questionable that HL & P's activities could be categorized as unreasonable under a "rule of reason" analysis.

■ Furthermore, application of the "rule of reason" or of a Section 2 monopolization charge would be conceptually difficult to apply in this case due to the unique status of a regulated electric utility. As a natural monopoly with regulated rates and services, HL & P does not fit the mold of the traditional monopolist sought to be restricted by Section 2. It does not have the direct power to control prices or exclude competition. Monopolization cases involving such regulated industries are special in nature and require close scrutiny. The reason for this is that regulation is considered an adequate replacement for the lack of competition that exists with a natural monopoly. In such a case, controlling a predominant share of the relevant market cannot infer the traditional monopoly power associated with an entity outside the regulated field.[20] Regulation of the monopoly also tends to diminish and make unlikely the willfulness or intent to maintain such monopoly power in violation of antitrust laws.[21] While such an abuse can and does

19. *See* Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.Rev. 1127, 1134 (1976): ("Thus, as long as there is no anticompetitive activity, the fact of injury to a competitor is *not* a concern of the antitrust laws.).

20. *See* Watson and Brunner, *supra* note 17, at 566–69. The authors discuss the peculiarities involved in applying antitrust law to regulated monopolies. With regard to market share data they comment:

> These industries are regulated precisely because it has been determined that competition either cannot or should not prevail there. Thus, the regulatory scheme not only seeks to act as a surrogate for competition, but may, for public interest reasons, affirmatively seek to exclude competition from the marketplace.
>
> \* \* \* \* \* \*
>
> In particular, where economic and legal forces cause a single firm to obtain a dominant market share, lower courts have recognized that this situation cannot support an inference of monopoly power. [Footnote omitted.] For example, in *United States v. United Shoe Machinery Corp.* [110 F.Supp. 295 (D.C.)] Judge Wyzanski held that there is no monopolization if the existence of a monopoly market share is due "solely to . .

licenses conferred by, and used within, the limits of the law, (including . . . *franchises granted directly to the enterprise by a public authority*)." (Emphasis supplied.)
Concerning the power to control prices, they add:

> Where prices of a regulated firm are subject to meaningful and timely review by the agency, the firm would appear to lack one of the two indicia of monopoly power.
>
> \* \* \* \* \* \*
>
> Thus, where the regulatory scheme is effective, regulated firms are not permitted to engage in monopoly pricing and are encouraged to operate their business efficiently—roughly the same ends as are sought through the promotion of competition. Consequently, in these circumstances, the absence of competition in a regulated marketplace need not mean that the statistically-dominant firm in that market possesses monopoly power over prices or that the prevailing structure necessarily frustrates antitrust policy.

21. *See* Watson and Brunner, *supra* note 17, at 575–79. The authors suggest that "willfulness" by a regulated natural monopoly may be shown only by evidence of predatory conduct or other exclusionary acts contrary to public policy.

occur, as exemplified in *Otter Tail, supra,* that happens when true competition is operative and anticompetitive activity surfaces.

The appellant Malls were correctly denied injunctive relief and damages for failure to prove violation and injury under the antitrust laws.

### III.

 A last point raised by appellants concerns the ability of this Court to exercise jurisdiction over their state statutory claims relating to discrimination in prices and services by HL & P. These claims, brought pursuant to Tex.Rev.Civ.Stat.Ann. art. 1438,[22] specifically refer to the different practices exercised by HL & P with regard to office buildings, apartment houses, and shopping centers.

The trial court relied primarily on the recent Texas decision in *Southwestern Bell Tel. Co. v. City of Kountze,* 543 S.W.2d 871 (Tex.Civ.App.1976), which held that exclusive jurisdiction rested with the state regulatory authority, the Public Utility Commission set up with the passage of PURA. It granted HL & P a directed verdict on this issue for lack of jurisdiction. We agree.

Appellants argue that they may maintain their state claims under Article 1438 based on Texas common law and independently of the jurisdictional grant outlined in PURA. Prior to the passage of PURA this may have been so. Since the passage of PURA, however, exclusive original jurisdiction concerning all electric rates, operations, and

service rests with the governing body of each municipality with an appeal available to the Public Utility Commission.[23] Article 1438, by contrast, does not speak to jurisdiction but merely establishes a cause of action for the discriminatory acts.

The *Kountze* case supports the current Texas law that jurisdiction lies with the Commission, and in the case of electrical utility rates and services, originally with the City of Houston. This is reaffirmed by the more recent case *General Tel. Co. of the Southwest v. City of Point Comfort,* 553 S.W.2d 808 (Tex.Civ.App.1977). We also note that an earlier decision, *Lea County Electric Cooperative, Inc. v. City of Plains,* 373 S.W.2d 90 (Tex.Civ.App.1963), held prior to the passage of PURA that an action based in part upon Article 1438 and competing rate structures between a city and an electric cooperative was properly dismissed by a trial court because proper jurisdiction for rate regulation and unjust charges rested initially with the city and not the courts. No cases since the enactment of PURA have been found which would indicate anything to the contrary.

We therefore affirm that part of the District Court decision along with the finding of no antitrust violation and injury.

AFFIRMED.

---

Contending that no court has yet considered the question in a regulated industry context, they offer three guidelines for consideration: (1) conduct enforcing a clearly articulated public policy against competition in a particular industry should not be considered exclusionary conduct demonstrating willful monopolization, (2) actions, or refusals to act, required because of one's status as a public utility or common carrier should not be considered predatory conduct, and (3) reasonable actions legitimately taken by a regulated monopoly to protect its ability to provide reliable, economic service to customers should not be considered a form of improper "willfulness", particularly where the monopoly's customers do not have alternative sources of obtaining the service the monopoly provides.

We are also aware that an action brought under Sections 1 or 2 of the Sherman Act requires a showing of restraint of trade or monopolization affecting interstate commerce. Because of our views already expressed denying relief to appellants for failure to show anticompetitive activity, a discussion of the interstate commerce issue is not necessary.

**22.** Tex.Rev.Civ.Stat.Ann. art. 1438 provides:

It shall be unlawful for any such corporation to discriminate against any person, corporation, firm, association or place, in the charge for such gas, electric current or power, or in the service rendered under similar and like circumstances.

**23.** Tex.Rev.Civ.Stat.Ann. art. 1446c, §§ 17(a), (d).