**HyPOINT TECHNOLOGY, INC.,**
**Plaintiff–Appellee,**

v.

**HEWLETT–PACKARD CO.,**
**Defendant–Appellant.**

No. 90–3526.

United States Court of Appeals,
Sixth Circuit.

Argued May 23, 1991.

Decided Nov. 21, 1991.

Rehearing and Rehearing En Banc
Denied Jan. 7, 1992.

John J. Eklund, Calfee, Halter & Griswold, Cleveland, Ohio, Ronald S. Katz (argued and briefed), Janet S. Arnold (briefed), and Victoria E. Brieant (briefed), Coudert Bros., San Francisco, Cal., for plaintiff-appellee.

Leslie W. Jacobs (argued), Mark A. Gamin, Thompson, Hine and Flory, Cleveland,

Ohio, Robert A. Skitol (briefed), C. Coleman Bird, James A. Meyers (briefed), Pepper, Hamilton & Scheetz, Washington, D.C., and S.T. Jack Brigham, III, and Marcia Howe Adams, Hewlett–Packard Co., Palo Alto, Cal., for defendant-appellant.

Evan R. Chesler (briefed), Cravath, Swaine & Moore, New York City, James W. Olson (briefed), Blue Bell, Pa., Ivor C. Armistead (briefed), Maynard, Mass. and Florinda Iascone (briefed), Lowell, Mass., for amici curiae.

Before JONES and NORRIS, Circuit Judges, and JOINER, Senior District Judge.[*]

JOINER, Senior District Judge.

Defendant Hewlett–Packard Co. (Hewlett–Packard) appeals from a judgment in favor of the plaintiff, HyPoint Technology, Inc. (HyPoint), in the amount of $1,500,000, treble the jury verdict. The complaint, filed on September 23, 1987, alleged in Counts I and II that the defendant unlawfully attained or maintained a monopoly in violation of section 2 of the Sherman Act. 15 U.S.C. § 2. Count III alleged a state law claim that Hewlett–Packard intentionally interfered with lawful contractual relations. The complaint sought both money damages and injunctive relief.

On February 24, 1988, the district court issued a preliminary injunction against the defendant, from which an appeal was taken. The injunction was vacated by this court on February 21, 1989, for insufficient findings of fact, the court reciting that "the record does not reveal that HyPoint has raised 'serious questions' for an antitrust violation." *HyPoint Technology, Inc. v. Hewlett–Packard Co.*, No. 88–3237 [869 F.2d 1491 (table)], slip op. at 4 (6th Cir. Feb. 21, 1989). The district court on remand refused to allow the defendant to present by summary judgment various issues going to legal deficiencies in plaintiff's theory. The case then proceeded to

trial, in the course of which plaintiff conceded abandonment of the attempted monopolization[1] and state law claims. On April 25, 1990, judgment was entered as set forth above. Defendant appeals, contending that the court erred in not directing a verdict and not granting judgment notwithstanding the verdict. We agree, and now reverse.

I.

Hewlett–Packard manufactures and sells computers. It also has a service organization for the repair and maintenance of its minicomputers. There was evidence that Hewlett–Packard's service organization accounted, during the period at issue, for approximately $800 million of an $806 million annual market in the service of Hewlett–Packard minicomputers. Only about one-seventh of Hewlett–Packard's income was derived from its service operations, however. Hewlett–Packard offered two service options for owners of its minicomputers: (1) a service contract covering repair and maintenance, for a set annual fee, or (2) repair for malfunctioning systems on a per-incident basis, for which the owner was charged the cost of the labor and materials involved—the "time-and-materials" (T & M) option.

HyPoint was initially a dealer in used minicomputers, including Hewlett–Packard minicomputers. In the course of this activity, HyPoint's employees had access to the service logs for Hewlett–Packard minicomputers which HyPoint was considering purchasing. HyPoint's principals became aware that Hewlett–Packard minicomputers were highly reliable and showed a diminished need for service as compared to other minicomputers. HyPoint's principals concluded that the annual costs of T & M service to owners of Hewlett–Packard minicomputers would be a great deal less than the cost of a service contract for the same period.

---

[*] The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

1. Plaintiff abandoned the attempted monopolization claim in light of the evidence that Hewlett–Packard possessed a market share more than sufficient for a finding of monopoly in the relevant market for which plaintiff argued.

HyPoint took advantage of this disparity by entering into the business of selling service contracts to Hewlett–Packard minicomputer owners in 1984, at a substantial discount from Hewlett–Packard's price. Instead of performing the repair services with its own customer engineers, however, as Hewlett–Packard did, HyPoint utilized Hewlett–Packard's T & M service to carry out the repairs. HyPoint's customers contacted Hewlett–Packard directly in order to request service, and HyPoint either paid the T & M invoices generated by Hewlett–Packard, or reimbursed the customer. HyPoint sold its contracts for three years without incident, and made greater net profits from the venture in each year, from $37,000 in the 1984–85 fiscal year to $347,-000 in the 1986–87 fiscal year.

It is not apparent from the record exactly when Hewlett–Packard became aware of HyPoint's activities, but it appears that it was not long after HyPoint began offering the contracts. This litigation arises from a decision announced by Hewlett–Packard in August 1987. Prior to that time, a customer engineer was guaranteed to be on site within four hours of the call for service. This four-hour guarantee was standard for contractual customers, and available for a fee to T & M customers, under the "Premium Response Time Option." HyPoint utilized this option as a matter of course. On August 1, 1987, Hewlett–Packard announced that the Premium Response Time Option would no longer be offered. After that time, a customer engineer was only guaranteed on-site within four hours for Hewlett–Packard contractual customers. Because HyPoint used Hewlett–Packard's T & M service to carry out its contracts, the business of HyPoint was affected.

The effect of the decision on HyPoint's business was immediate. There was testimony at trial from numerous customers of HyPoint's, or firms which had been considering HyPoint's contracts, indicating the customers' extreme sensitivity to the speed of response when their computers are down, a proposition which can easily be believed. HyPoint made inquiry into having third-party maintenance organizations perform the repair services on their contracts, but the evidence reflects that these are few and scattered, and HyPoint was unable to locate such third-party firms for its customers in many areas. HyPoint lost virtually all of its service customers within a short time after Hewlett–Packard's decision was announced.

HyPoint's theory at trial was that Hewlett–Packard's decision was calculated to eliminate HyPoint and similarly situated competitors from the market, without legitimate business justification. The relevant market asserted by HyPoint was the service of Hewlett–Packard minicomputers, and HyPoint presented evidence showing that Hewlett–Packard had monopoly power in that market.

Hewlett–Packard argued at trial that the relevant market was the sale of minicomputers, in which Hewlett–Packard does not have market power, and that service is simply a part of the sales market. Hewlett–Packard also argued that it had various legitimate business justifications for the decision to terminate four-hour response time to T & M customers. In moving for a directed verdict or judgment notwithstanding the verdict, Hewlett–Packard also argued as a matter of law that no antitrust violation was shown by the facts of this case, and that HyPoint lacked antitrust standing.

## II.

In light of the articulation by the Supreme Court of the antitrust standing requirement for suits under the antitrust laws, beginning in 1977 with *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), and developed in the next several years in, *e.g.*, *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); and *Blue Shield v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), it is appropriate to turn first to the issue of antitrust standing before weighing the issues of relevant market, market share, etc.

In other words, before discussing the claims made in this case regarding relevant market and market power we must determine if HyPoint has antitrust standing to assert claims under the Supreme Court's precedents. Although we have serious doubts that the relevant market is the service industry, believing instead that service in this case is so integral to sales that the relevant market is sales, we will for the purpose of discussing antitrust standing accept the service industry as the relevant market.

Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing ensures that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

Standing is conferred upon private antitrust plaintiffs by section 4 of the Clayton Act, which provides, in pertinent part:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15. In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Court stated that the statutory language requires more than mere injury proximately caused by a violation of the antitrust laws:

Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). The Supreme Court in *Brunswick* took the language "by reason of anything forbidden in the antitrust law" and gave real effect to it. 429 U.S. at 488, 97 S.Ct. at 697. "Anything forbidden in the antitrust law" makes it necessary to show that the injury reflects an "anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." 429 U.S. at 489, 97 S.Ct. at 697. We are instructed in looking at the cause of the injury to look at whether the conduct was anticompetitive, and if it was not anticompetitive, standing is not shown.

The requirement of injury caused by anticompetitive conduct was not met here. Hewlett–Packard's termination of the four-hour response time for T & M customers had no anticompetitive impact. It was in fact beneficial to competing service organizations. HyPoint presented evidence showing that Hewlett–Packard's decision angered T & M customers and caused them to search for alternative service providers. The elimination of the four-hour response time also made it easier for new firms to enter the market, since it lowered the standard for service. The diminution in service without a corresponding decrease in price was the economic equivalent of an increase in price, which is clearly not anticompetitive. Hewlett–Packard's decision, standing alone, was therefore not of concern to the antitrust laws.

Plaintiff contends that it has standing because HyPoint was a "competitor" in the market. For this purpose, we are quite willing to agree that HyPoint was a competitor of Hewlett–Packard as to service contracts, in a semantic sense, but not as a matter of economics. The premise upon which HyPoint's argument rests is flawed. HyPoint's contention assumes that every injury to a competitor is an antitrust viola-

tion. The antitrust laws were enacted for "the protection of *competition,* not *competitors." Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 825 (6th Cir.1982). No injury to competition was shown here.

Second, accepting for the moment plaintiff's inapposite focus upon plaintiff's alleged competitor status, no injury to competition occurred as a result of HyPoint's elimination from the market. HyPoint's business had no effect upon Hewlett–Packard's monopolization of the market. The goal of competition is the elimination of the inefficient competitors. HyPoint had no potential to make the alleged monopolist, Hewlett–Packard, more efficient, since HyPoint was forced to pay for Hewlett–Packard's services in order to carry on its business. Hewlett–Packard was free to reduce output and increase prices, the standard evils of monopoly power, to the same extent whether or not HyPoint existed. A logical flaw in plaintiff's theory is that Hewlett–Packard could have achieved exactly the same effect upon HyPoint's business merely by raising the cost of its T & M service. In fact, Hewlett–Packard did so subsequent to the filing of this suit, but HyPoint wisely declined to assign this action as a fresh antitrust violation. Because the demise of HyPoint's service contract business did not diminish competition, HyPoint is unable to demonstrate antitrust injury even under this attenuated theory linking the cause of plaintiff's injury and the purposes of the antitrust laws.[2]

While none of the Supreme Court's precedent on the antitrust standing question addresses alleged market participants who function as HyPoint does here, two other courts of appeals have reached identical conclusions to ours in similar circumstances. In *Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343 (5th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), the Fifth Circuit

held that the owners of shopping malls lacked standing under the antitrust laws to force an electric company to provide power to only one hook-up in the malls, from which the owners could re-sell the power to their tenants. The court observed:

> What the Malls wish to do is to pre-empt the utility's business for their own profit, not as true competitors for the same market.

We hold that appellants have proven no antitrust violation and no antitrust injury.

> The trial court noted, and we agree, that the activity sought by the appellants is more akin to mere "substitution" than to competition. By achieving the goal to resell electricity on the retail level, appellants will be merely plugging themselves into the flow of electricity and reaping profits as a non-competitive middleman.

615 F.2d at 353. In *General Industries Corp. v. Hartz Mountain Corp.,* 810 F.2d 795 (8th Cir.1987), the Eighth Circuit held with minimal analysis that a terminated brokerage firm, which merely solicited retail purchasers for the defendant manufacturer, lacked standing as a consumer or competitor to bring an antitrust action. Like the plaintiff in *Almeda Mall,* HyPoint functioned as a "non-competitive middleman." There was no causal link shown in this case between the termination of the four-hour response time, or its fatal impact upon HyPoint's service contract business, and any diminution of competition such as would trigger antitrust scrutiny.

In addition, HyPoint has not incurred an antitrust injury. Damages do not constitute "antitrust injury" unless "attributable to an anti-competitive aspect of the practice under scrutiny," *Atlantic Richfield,* 110 S.Ct. at 1889. Plaintiff asserts that HyPoint had competitive significance in the market because HyPoint occasionally carried out minor repairs upon small portable components at its facility, using its own employees. However, while this activity was competition in the relevant market, it was not the source of plaintiff's damages.

---

**2.** Plaintiff did not attempt to prove that HyPoint's injury resulted from an antitrust violation to HyPoint as a consumer of Hewlett–Packard's services.

The damages for which HyPoint sought compensation at trial resulted from the inability of HyPoint, after Hewlett–Packard's policy change, to fulfill the terms of its contracts by using Hewlett–Packard's T & M service, a circumstance arising solely from its *vicarious* service business. We recognize that HyPoint probably also lost some revenue from these minor repairs by HyPoint's own personnel when HyPoint lost its service contract customers; however, nothing prevented HyPoint from continuing to offer this kind of service in isolation after Hewlett–Packard's decision. HyPoint therefore received no cognizable antitrust injury.

Plaintiff relies upon Hewlett–Packard's intent to eliminate plaintiff and others similarly situated, one of the five factors set out by this court in *Southhaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir.1983); *see also Peck v. General Motors Corp.*, 894 F.2d 844, 846 (6th Cir.1990). In *Southhaven*, however, this court expressly disclaimed an intent to restrict the standing inquiry to the factors listed. *See also Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (pointing out that, "in *McCready*, we specifically held: 'The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the [defendants],'" *id.* at 537, 103 S.Ct. at 908, and that it is "virtually impossible to announce a black-letter rule that will dictate the result in every case," *id.* at 536, 103 S.Ct. at 908). Our review is not confined to a pro forma checklist, but is directed to the difficult question of the competitive significance of the activity at issue. The standing inquiry "forces the parties and the court to reason closely about the nature of the antitrust violation alleged in order to test whether the injury and damages claimed by the plaintiff match the rationale for finding any violation in the first place." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 334.2a, at 324–25 (Supp.1989). We conclude that HyPoint lacked antitrust standing to challenge Hewlett–Packard's

action for lack of the requisite antitrust causation and injury.

### III.

In light of our decision on antitrust standing, it is not necessary to fully analyze and discuss the claims made by the defendant that the trial court erred regarding the relevant market, or in other respects. We have already indicated that we have doubts that the product market (minicomputer service) is the relevant market in this case, when quality and cost of service so profoundly affect sales. The court finds that the plaintiff lacks antitrust standing, therefore, defendant is entitled to judgment.

REVERSED, with direction to enter judgment for the defendant.