*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0424p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NICSAND, INC.,

　　　　　　*Plaintiff-Appellant,*

　　　*v.*

3M COMPANY,

　　　　　　*Defendant-Appellee.*

No. 05-3431

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-02619—Ann Aldrich, District Judge.

Argued: March 7, 2007

Decided and Filed: October 17, 2007

Before: BOGGS, Chief Judge; MARTIN, SILER, BATCHELDER, DAUGHTREY, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, and GRIFFIN, Circuit Judges.[*]

---

**COUNSEL**

**ARGUED:** Dennis E. Murray, Jr., MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellant. Dean Ringel, CAHILL, GORDON & REINDEL, New York, New York, for Appellee. **ON BRIEF:** Dennis E. Murray, Jr., MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellant. Dean Ringel, CAHILL, GORDON & REINDEL, New York, New York, James P. Murphy, SQUIRE, SANDERS & DEMPSEY, Washington, D.C., J. Philip Calabrese, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee.

　　　　SUTTON, J., delivered the opinion of the court, in which BOGGS, C. J., SILER, BATCHELDER, GILMAN, GIBBONS, ROGERS, COOK, McKEAGUE, and GRIFFIN, JJ., joined. MARTIN, J. (pp. 13-22), delivered a separate dissenting opinion, in which DAUGHTREY, COLE, and CLAY, JJ., joined.

---

[*]The Honorable Karen Nelson Moore, Circuit Judge, took no part in the consideration or decision of the case.

1

---

**OPINION**

---

SUTTON, Circuit Judge.  Between 1987 and 2001, NicSand and 3M were the only nationwide suppliers in the market for do-it-yourself automotive sandpaper, and they competed for the business of six large retailers, which controlled 80% of the market and which (with one exception) offered their shelf space on an exclusive basis for a year at a time.  NicSand developed this niche market and eventually gained a 67% share of it.  Between 1997 and 2001, however, it lost most of the market when 3M offered the large retailers greater up-front discounts and longer exclusive agreements than NicSand had offered in the past or apparently was willing to offer in the future.

When NicSand filed an antitrust lawsuit to complain about 3M's conduct, the district court dismissed the complaint for lack of antitrust standing and, more particularly, for lack of a cognizable antitrust injury.  Because 3M did not engage in below-cost—or predatory—pricing, because five of the six large retailers demanded exclusivity as a precondition for doing business, because the allegations show no more than that 3M competed with its rival on the same essential terms that NicSand and the large retailers had already established for this market and because the antitrust laws in the end protect competition, not competitors, we affirm.

I.

This case comes to us as an appeal from a Rule 12(b)(6) dismissal.  We thus look to NicSand's allegations in the complaint (in truth, the first amended complaint) to determine the details of the dispute—who the parties are, how the market for do-it-yourself automotive sandpaper works and how the parties competed with each other.

*The parties.*  NicSand is an Ohio corporation based in Berea, Ohio, and has been in business since 1982.  It makes a variety of products for automotive body repair, including automotive sandpaper (technically speaking, coated abrasives), which consumers use before, during or after painting a car or truck.  Sales of automotive sandpaper accounted for one-half of NicSand's revenue in 1996.  3M is a Delaware corporation based in Maplewood, Minnesota.  In addition to making a variety of other products, 3M produces automotive sandpaper.

*The market for do-it-yourself automotive sandpaper.*  NicSand "largely developed" the market for do-it-yourself automotive sandpaper, increasing the number of products offered in the market from 20 in 1987 to 80 in 2000.  Am. Compl. ¶ 10.  The development of the market, NicSand claims, was "fueled primarily by [its] superior marketing, superior packaging, innovation, and superior value."  *Id.* ¶ 11.

Between 1987 and 2000, just two companies supplied automotive sandpaper (and related products) in the national market:  NicSand and 3M.  As of 1995, NicSand was the dominant player, holding a 67% share of the market.

NicSand and 3M did not sell their automotive sandpaper products directly to consumers; they instead relied on retailers to distribute the products through a "highly concentrated" retail market.  *Id.* ¶ 14.  In 1997, just six large retailers—Advance Auto Parts, AutoZone, CSK Auto, Kmart, Pep Boys, Wal-Mart—controlled 80% of the retail market, while smaller retailers divided up the remaining 20% of the market.

Perhaps due to the relatively "small value" of the market, five of the six large retailers sold just one brand of the product at a time, meaning they permitted NicSand or 3M, but not both, to sell

its products at the stores. *Id*. ¶ 62. "In order to simplify planning and reduce costs," the large retailers also re-negotiated these single-brand agreements just once a year, giving the supplier a year-long "de facto exclusive agreement" with each retailer. *Id.* ¶ 25. In order to replace an existing supplier of automotive sandpaper, a new supplier not only had to offer favorable prices but also had to (1) produce a full line of do-it-yourself automotive sandpaper, (2) provide racks and other display equipment for the retailer, (3) provide a discount on the retailer's first order and (4) purchase the retailer's existing supply of the sandpaper. Because the large retailers typically restocked the full line of sandpaper products five to seven times a year, buying out a retailer's existing supply of the sandpaper could cost a supplier up to 14% to 20% of its annual revenues from that retailer.

NicSand complied with these requirements in seeking to obtain the large retailers' business, and by every measure it succeeded. By 1996, it was the exclusive supplier for four of the large retailers: Kmart, Advance Auto, CSK Auto and AutoZone. And along with 3M it supplied Pep Boys, the one large retailer that did not insist on an exclusive agreement.

3M was the sole supplier of the sixth large retailer—Wal-Mart. NicSand did not—and could not—compete for this business, because Wal-Mart sought a single supplier that could meet all of its sandpaper needs, which included providing two products that NicSand did not make: sandpaper for Wal-Mart's power tool and paint departments.

NicSand made substantial profits on its exclusive-sales agreements with four of the six large retailers. In 1996, NicSand's annual sales to Kmart totaled $475,000 with profit margins of 38%. In 1997, its sales to Advance Auto totaled $550,000 with margins of 49%, and its sales to CSK Auto totaled $369,000 with margins of 44%. In 1999, its sales to AutoZone totaled $2,200,000 with margins of 39%.

*Competition between the two companies from 1997 through 2001.* According to NicSand, 3M sought to monopolize the market for do-it-yourself automotive sandpaper beginning in 1997. To that end, 3M offered Kmart $300,000 in 1997 as an incentive to switch suppliers and to enter into an "explicit or *sub rosa*" exclusive-dealing agreement for "several years." *Id.* ¶ 23. Kmart accepted 3M's offer and told NicSand that it would not review price quotes from NicSand for a "few years." *Id.* ¶ 26 (emphasis omitted).

One year later, 3M did the same thing with Advance Auto and CSK Auto, offering the one $285,000 and the other $200,000 to switch suppliers and to enter into "multi-year" exclusive-dealing agreements. *Id.* ¶¶ 30, 32. Advance Auto and CSK Auto accepted 3M's offers and refused to discuss switching suppliers with NicSand "for at least a few years." *Id.* ¶ 37.

Two years later, in 2000, 3M offered a similar deal to AutoZone, which long had been NicSand's largest customer. 3M offered AutoZone $1,000,000 to switch suppliers and to enter a "multi-year" exclusive-dealing agreement. *Id.* AutoZone accepted the offer. When contacted by NicSand, AutoZone refused to discuss switching back to NicSand as a supplier "for at least a few years." *Id.*

By 2001, NicSand's only remaining customers were Pep Boys (which sold NicSand and 3M products) and several smaller retailers. With a significant drop in its sales volume, NicSand lost its economies of scale; its "raw material costs increased dramatically," *id.* ¶ 41; and it could no longer "fill existing orders at an appropriate cost," *id.* ¶ 60. Because NicSand could "no longer . . . compete," it left the market for do-it-yourself automotive sandpaper in 2001 and sought to reorganize under Chapter 11 of the Bankruptcy Code. *Id.* ¶ 41. Since leaving the market, NicSand alleges that retailers (though it makes no allegations about suppliers like 3M) have raised consumer prices for do-it-yourself automotive sandpaper by as much as 70%.

*The complaint*.  On December 30, 2003, NicSand filed this lawsuit under § 4 of the Clayton Act, claiming that 3M had monopolized, or attempted to monopolize, the market for automotive sandpaper in violation of § 2 of the Sherman Act.  *See* 15 U.S.C. §§ 2, 15.  The complaint sought (1) to recover NicSand's "lost profits" or the "value" of NicSand's business and (2) to treble those damages as permitted under the antitrust laws.  Compl. at 9.  The district court dismissed the complaint under Rule 12(b)(6) for lack of antitrust standing because NicSand "failed to . . . plead an injury to competition resulting from 3M's conduct."  D. Ct. Op. at 5.

## II.

## A.

At first glance, one might fairly wonder whether a complaint like this one should be dismissed for lack of antitrust standing.  Standing, in a conventional Article III sense, requires just proof of actual injury, causation and redressability.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  And NicSand readily satisfies these requirements:  It was injured (when it lost these accounts); 3M caused the injury (when it offered better terms to the retailers than NicSand had offered in the past); and NicSand's request for damages will redress its injury (by permitting it to recover the profits—indeed, three times the profits—it made before 3M entered the picture).  Seemingly making matters easier for NicSand, we look at its complaint through the prism of Rule 12(b)(6), requiring us to accept all of its allegations and all reasonable inferences from them as true.  *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002).

Yet antitrust standing and Article III standing are not one and the same, and we not only may—but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing.  In the first place, an antitrust claimant must do more than make "allegations of consequential harm resulting from a violation of the antitrust laws," and that is true even when the complaint is "buttressed by an allegation of intent to harm the [claimant]."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983).  Even when a complaint makes these allegations, it may not proceed when "[o]ther relevant factors—the nature of the [claimant's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [claimant's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement."  *Id.*  Most pertinently for our purposes, antitrust standing "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  Far from being "a mere technicality," antitrust standing "is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws" by claimants seeking to halt the strategic behavior of rivals that increases, rather than reduces, competition.  *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).

In the second place, antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be.  "It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966–67 (2007).  Given the limited "success of judicial supervision in checking discovery abuse" and "the threat [that] discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings," *id.* at 1967, the federal courts have been "reasonably aggressive" in weeding out meritless antitrust claims at the pleading stage, *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997); *see Bell Atl.*, 127 S. Ct. at 1966 ("[S]omething beyond

the mere possibility of [relief] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.") (internal quotation marks omitted).

For these reasons, it should come as no surprise that, in the seminal antitrust standing case, the Supreme Court dismissed the claim under Rule 12(b)(6). *See Associated Gen. Contractors*, 459 U.S. at 545–46. And our court has dismissed numerous lawsuits for lack of antitrust standing under Rule 12(b)(6). *See Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000); *Valley Prods.*, 128 F.3d at 407; *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 848 (6th Cir. 1990); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1351–52 (6th Cir. 1989); *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90 (6th Cir. 1989); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1088 (6th Cir. 1983); *see also N.W.S. Mich., Inc. v. Gen. Wine & Liquor Co.*, 58 F. App'x 127, 129–30 (6th Cir. Feb. 6, 2003); *Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys.*, No. 98-5668, 1999 WL 1045098, at *7 (6th Cir. Nov. 10, 1999); *Dry v. Methodist Med. Ctr. of Oak Ridge, Inc.*, No. 89-5470, 1990 WL 3489, at *5 (6th Cir. Jan. 19, 1990).

### B.

Of the various requirements for establishing antitrust standing, the one that concerns us here is antitrust injury, which is a "necessary, but not always sufficient," condition of antitrust standing. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). An antitrust claimant must show more than merely an "injury causally linked" to a competitive practice; it "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis added). At a minimum, this requirement means that one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition. "'[I]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition," *Cargill*, 479 U.S. at 109–10 (quoting *Brunswick*, 429 U.S. at 488) (second alteration in original), because "[t]he antitrust laws . . . were enacted for 'the protection of *competition* not *competitors*,'" *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *see id.* (prohibiting competitor claim where the claimant sought in damages "the profits they would have realized had competition been reduced"). Accordingly, even though a claimant alleges that an injury is "causally related to an antitrust violation," it "will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny." *Atl. Richfield*, 495 U.S. at 334.

Moreover, a "naked assertion" of antitrust injury, the Supreme Court has made clear, is not enough; an antitrust claimant must put forth factual "allegations plausibly suggesting (not merely consistent with)" antitrust injury. *Bell Atl.*, 127 S. Ct. at 1966; *see id.* at 1964–65 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . [A] complaint [must have] enough factual matter (taken as true) to suggest [that an antitrust injury occurred].") (internal quotation marks omitted); *id.* at 1966 ("[T]he threshold requirement of Rule 8(a)(2) [is] that the plain statement [in the complaint] possess enough heft to show that the pleader is entitled to relief.") (internal quotation marks omitted); *id.* ("[A] naked assertion . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . . .").

All of this is not to say that one competitor may never sue another under the antitrust laws. But courts typically have permitted such claims to proceed only when one of the rivals has engaged in some form of predatory pricing or illegal tying—when the rival has engaged in something more than vigorous price, product or service competition. *See, e.g., Eastman Kodak Co. v. Image*

*Technical Servs., Inc.*, 504 U.S. 451, 461–79 (1992) (illegal tying); *Utah Pie Co. v. Cont'l Baking Co.*, 386 U.S. 685, 696–98 (1967) (predatory pricing); *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 921 (6th Cir. 2005) (predatory pricing); *LePage's Inc. v. 3M*, 324 F.3d 141, 155–57 (3d Cir. 2003) (illegal tying); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1127–32 (6th Cir. 1981) (illegal tying).

C.

In attempting to satisfy this requirement, NicSand targets three of 3M's competitive tactics: (1) the up-front payments that 3M offered to the four retailers; (2) the multi-year terms of the agreements between 3M and the retailers; and (3) the exclusive nature of these agreements. Because "the injury and damages" suffered by NicSand from these competitive practices, however, do not "match the rationale for finding [an antitrust] violation," *HyPoint Tech.*, 949 F.2d at 879—but indeed flow from the kind of competition that the antitrust laws were designed to foster—NicSand has not established a cognizable antitrust injury.

*The up-front discounts.* NicSand first complains about the "cash payment[s]" that 3M offered four of the large retailers to obtain their business—$300,000 to Kmart in 1997, $285,000 to Advance Auto in 1998, $200,000 to CSK Auto in 1998 and $1 million to AutoZone in 2000. Br. at 21; *see* Am. Compl. ¶¶ 21, 30, 32, 35. Even after accounting for these payments, however, NicSand concedes that 3M did not engage in any form of predatory pricing—it concedes in other words that 3M did not sell automotive sandpaper below cost with the goal of recouping its losses by charging monopolistic prices later. *See* NicSand's Mem. in Opp. to 3M's Mot. to Dismiss, JA 132 ("NicSand's Amended Complaint Is Not Premised On Predatory Pricing."); Reply Br. at 6.

Given this concession and given the realities of this market, 3M's payments do not show antitrust injury. If the up-front payments, when combined with the price terms that 3M offered each of these large retailers, "are not predatory, any losses flowing from them cannot be said to stem from an *anticompetitive* aspect of defendant's conduct. It is in the interest of competition to permit . . . firms to engage in vigorous competition, including price competition." *Atl. Richfield*, 495 U.S. at 340–41 (internal quotation marks and footnote omitted). The market conditions at the time 3M made these offers, according to NicSand's own allegations, buttress the point. In 1997, this market consisted primarily of six large retailers, and NicSand was the sole supplier of four of them. NicSand controlled 67% of the market and earned 38–49% profit margins on its sales to these four retailers. Am. Compl. ¶¶ 22, 31, 33, 36. NicSand gives no explanation why it has a right to preserve 38–49% margins—under the antitrust laws no less—on a product, sandpaper, that (so far as the complaint is concerned) does not take any ingenuity to make.

Rather than upsetting the competition-enhancing goals of the antitrust laws, the payments furthered them. The "payments" are nothing more than "price reductions offered to the buyers for the exclusive right to supply a set of stores under multi-year contracts." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 45 (1st Cir. 2001). "[C]utting prices in order to increase business often is the very essence of competition"; and "mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. We must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) (internal quotation marks and citation omitted); *accord Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004). "It would be ironic indeed if the standards" for establishing antitrust injury "were so low that antitrust suits themselves became a tool for keeping prices high." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226–27 (1993).

One of the *existing* barriers to entry in this market, moreover, *required* would-be suppliers to offer up-front payments. Before they would consider switching suppliers, the large retailers required new suppliers to offer to (1) purchase the retailer's existing supply of automotive sandpaper and (2) provide a discount on the retailer's first order. Together these demands could cost a new supplier up to 23% of its first year's revenues. *See* Am. Compl. ¶¶ 48, 49, 51. All of this goes to show that, by offering up-front discounts to the retailers, 3M was merely offering them something that, generically speaking, they already insisted on receiving. That 3M offered greater discounts, though still non-predatory discounts, to win the retailers' business does not offend the antitrust laws, much less undermine the competitive environment those laws were designed to foster.

*The multi-year terms.* Just as 3M's advances amounted to legitimate competition, so did its decision to enter into multi-year agreements. Once again, 3M did nothing more than compete on terms that the market already required. A would-be supplier does not violate the antitrust laws by *offering* a multi-year agreement in a market in which the retailers already *require* one-year "de facto" agreements. *See id.* ¶ 25. If the buyers in a market demand one thing, the antitrust laws do not prohibit *an entrant* from offering that same thing on slightly different terms. *Cf. Verizon Commc'ns*, 540 U.S. at 411 ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue."); *Eastman Kodak*, 504 U.S. at 466–67 (noting the importance of considering "actual market realities" when reviewing an antitrust claim).

From the perspective of a retailer, multi-year agreements permit the retailer to insist that the supplier charge lower prices. Committing to a multi-year agreement, indeed, is no different from buying in bulk. From the perspective of a supplier, multi-year agreements ease an aspiring entrant's ability to clear existing market barriers. Here, the large retailers demanded that a new supplier buy out the former supplier's products and offer a discount on the first sale, all at a cost of up to 23% of the new supplier's first year sales. It is far easier for a market entrant to clear these barriers when it is given several years, rather than just one, to recoup this investment. *See* 2 Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 348c ("[A] temporary purchase commitment that overcomes an entry barrier increases rather than reduces competition.").

Had 3M used illegal tying to obtain a multi-year agreement, that might be another matter. But NicSand makes no such allegation. Reply Br. at 11–12 (disclaiming any such contention). What NicSand complains about instead is a *quid pro quo*—a multi-year (rather than a single-year) agreement for 3M in return for a substantial price discount (rather than a smaller discount) for the retailers. Having previously paid NicSand prices generating 38–49% profit margins, the large retailers cannot be blamed for accepting better prices with 3M for several years, not just one.

Contrary to NicSand's suggestion, the multi-year nature of the agreements makes the accompanying advances less troublesome, not more so. It is true, as NicSand repeatedly asserts, that the advances made by 3M to the retailers outpaced NicSand's yearly profits from sales to each of those retailers. *See* Reply Br. at 3; Supp. Br. at 9. But given a reasonable estimate of the length of these "several year[]" agreements, say three to five years, NicSand's complaint itself demonstrates that it could have competed for the exact same multi-year agreements with its customers. Am. Compl. ¶ 23. Had NicSand approached its customers with similar deals, it could have expected profit margins of 17–39% on its sales to Kmart, Advance Auto, CSK Auto and AutoZone. *Id.* ¶¶ 21, 30, 32, 35. While these margins would have been lower than the 38–49% margins NicSand realized before 3M's entrance into the market, NicSand offers no explanation why this modest reduction in profit margins on a product of this sort is a concern of the antitrust laws.

*The exclusivity of the agreements.* Unable to show that it suffered an antitrust injury from 3M's vigorous price competition and unable to show that it suffered an antitrust injury from 3M's offer to extend the agreements to cover "at least a few years," *id.* ¶ 37, NicSand argues that the

exclusivity of the agreements establishes the requisite injury. While exclusive agreements in some instances may create impermissible barriers for new entrants to a market and may permit a supplier to charge monopoly prices, *see Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961), NicSand has not claimed—and cannot tenably claim—that it suffered these anticompetitive effects.

As with NicSand's other complaints, so here: we cannot ignore the demands of the marketplace in which these agreements arose. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns*, 540 U.S. at 411; *see Bell Atl.*, 127 S. Ct. at 1972 (noting that industry history may provide "a natural explanation" for conduct). According to NicSand's own complaint, all but one of the large retailers made exclusivity a *condition* for doing business with a new supplier. NicSand of course complied with this requirement (and several others) in obtaining the business it held in 1997, and 3M complied with this requirement (and several others) in winning some of that business away. If *retailers* have made supplier exclusivity a barrier to entry, one cannot bring an antitrust claim against a *supplier* for acquiescing to that requirement. Put another way, NicSand has not sued 3M because it wants to share shelf space with its competitor; it sued 3M because it wants that shelf space all to itself—just as it had it in 1997. This is just the kind of all-for-one-and-all-for-one competitor claim that the antitrust laws do not protect.

Nor can NicSand plausibly argue that the exclusivity requirement created entry barriers for *it* in this market. Before 1997, NicSand controlled 67% of the market and used the existing barriers to entry—annual product reviews and exclusive shelf space—to preserve its lock on the market. From 1997 to 2000, 3M competed for and won the business of four retailers that NicSand formerly supplied. Through it all, however, NicSand was not a potential market entrant; it was the market leader. Yet NicSand offers no explanation why it could not compete for these multi-year agreements nor why (in view of its high margins) it could not match 3M's discounts. As the market leader, NicSand was on the inside looking out, and for whatever reason the company chose not to compete. *See* 2 Areeda & Hovenkamp, *supra*, ¶ 348d3 ("Of course, a foreclosure alleged to be illegal because it deters entry does not injure a plaintiff already in the market. Impeding the entry of others grants a benefit to those already in the market.") (footnote omitted).

To the extent exclusivity created a market barrier, it was 3M that faced the problem, and it was 3M that overcame it. In 1997, according to the complaint, 3M won the business of Kmart with its "several years" offer; as the incumbent, NicSand had every opportunity to compete and yet it failed to do so. In 1998, 3M overcame a similar hurdle in obtaining the business of Advance Auto and CSK Auto; again, NicSand faced no such barrier and yet still failed to compete. In 2000, when NicSand was the exclusive supplier of only one big-box retailer, it still controlled a substantial portion of the market due to the volume of its business with AutoZone. *Compare* Am. Compl. ¶ 36 ($2,200,000 in sales to AutoZone), *with id.* ¶ 22 ($475,000 in sales to Kmart), *id.* ¶ 31 ($550,000 in sales to Advance Auto), *and id.* ¶ 33 ($369,000 in sales to CSK Auto). Yet 3M successfully competed for AutoZone's business. Though NicSand declared bankruptcy in 2001, it says nothing in the complaint about efforts before then to recoup the business from Kmart (which entered the 3M agreement in 1997) or from Advance Auto or CSK Auto (which entered the agreements in 1998). Nor does 3M's size make a difference to the disposition of these allegations. *See Brunswick*, 429 U.S. at 487–88 ("Yet respondents' injury . . . bears no relationship to the size of . . . its competitor[]. Respondents would have suffered the identical loss but no compensable injury had the acquired centers instead . . . been purchased by shallow pocket parents . . . . Thus, respondents' injury was not of the type that the statute was intended to forestall.") (internal quotation marks omitted). In the end, NicSand simply has not alleged facts establishing that the agreements in and of themselves created market-entry barriers that caused it a cognizable antitrust injury. *See Bell Atl.*, 127 S. Ct. at 1974 (holding that plaintiffs must allege "enough facts" to "nudge[] their claims across the line from conceivable to plausible").

NicSand's injury also does not stem from 3M's alleged monopolization of the market. For most of the time NicSand was losing business, it retained control of a significant share of the market. While NicSand complains about the up-front discounts 3M offered, it does not allege that 3M was selling below cost, and the numbers NicSand itself offers demonstrate that 3M's advances were comfortably within NicSand's multi-year profit margins. While NicSand's loss of business may have propelled 3M into a dominant market position, its injury does not correspond to any allegedly anticompetitive effect on the market but rather a truly competitive one.

Any doubt about the appropriate resolution of this case can be laid to rest by *Indeck Energy Services v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000). There an energy supplier (Indeck) alleged that a competitor (Consumers Energy) violated the antitrust laws by signing an exclusive supply contract with General Motors for a period of five to ten years. *Id.* at 975. The contract came on the heels of similar contracts with "17 other large industrial/commercial customers," through all of which Consumers Energy "succeeded in excluding competition from over 80 percent of the Relevant At Risk Market." *Id.* (internal quotation marks omitted). Central to the resolution of that case, as to this one, was that "the only harm allegedly suffered by Indeck was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace competition." *Id.* at 977.

*Indeck* was the harder case. Consumers Energy controlled 80% of the market when its contracts preserved its hold on the market, while NicSand controlled 67% of the market when it began losing its hold on the market. Consumers Energy entered into longer exclusive contracts (5–10 years) than 3M did ("several years," "few years" or "multi-year"). And Consumers Energy did not unseat the dominant market leader (as 3M did) but instead hindered a potential market entrant. Indeck was hardly a dominant supplier of energy, as it provided cogeneration services (recycling factory waste to create energy), which diminish a customer's need for traditional energy rather than supply such energy. Indeck, in short, was more akin (far more akin) to a market entrant than NicSand.

In its en banc papers, NicSand does not claim that *Indeck* (or for that matter any of our antitrust-injury precedents) should be overruled but insists that it can be distinguished—first on the ground that today's case involves a series of contracts with several retailers as opposed to several contracts with one retailer. As a result, it submits, while Indeck's harm resulted only from competition, NicSand suffered not simply as a single competitor in the market, but as a proxy for all competitors and thus for all competition. But this seems to invert the relative vices and virtues of the two fact patterns. While NicSand originally held all of the contracts with the retailers in question and lost them to competition, Indeck lost out on a single contract and alleged that it found itself in a market where a single dominant firm controlled 80% of the market with exclusive contracts of 5–10 years with all of the major industrial and commercial customers. If the harm to the market is the entry barriers established by "exclusive contracts," it is Indeck, not NicSand, that makes the better proxy for injury to competition in the market rather than harm to a competitor. NicSand had the opportunity to compete for each of the contracts, while Indeck never had that opportunity because of the existing exclusive contracts. Nonetheless, we concluded in *Indeck* that there was no harm to competition because Indeck "failed to allege how [the exclusive contracts] have injured competition, especially in light of the discounted rates offered to the customers, in light of the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [providers] at the conclusion of the contracts." 250 F.3d at 977–78. We rested our decision on these grounds, and these grounds control us here—with NicSand, if anything, having the less compelling complaint. When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury. *See* 11 Areeda & Hovenkamp, *supra*, ¶ 1823b ("Clearly not a victim of antitrust injury is the exclusive dealing partner whose business relationship was terminated in favor of a different exclusive dealing partner.").

NicSand next maintains that *Indeck* can be distinguished on the ground that 3M's exclusive dealing arrangements have eliminated a superior product, noting that NicSand allegedly provides a better variety of products and better service than 3M. *Indeck*, it is true, noted that antitrust actions by marketplace competitors "must at least allege that exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative" because these developments might show "that *competition* itself was harmed by an[] act of the defendant[]." 250 F.3d at 977. But the court still rejected Indeck's claim even though the company had alleged that its competitor's conduct caused the market to become less diversified because Indeck provided "alternative sources of electrical power," namely thermal power, while its competitor supplied only traditional electrical power. *Id.* at 975 (internal quotation marks omitted). As *Indeck* suggests, then, such an allegation may be necessary to establish antitrust standing for a competitor, but it is not sufficient. Under NicSand's reading, every competitor could proceed to discovery (and avoid showing a true antitrust injury) by asserting an unelaborated claim that it provides better service than its competitors. *Indeck* did not permit such a pleading and neither will we.

Even aside from *Indeck*, NicSand suggests in its en banc papers, and the dissent echos the point, that it is an efficient defender of the marketplace because the retailers face a "collective action problem." Dissent at 22. In its view, this collective action problem—that no retailer will accept the higher prices of one supplier in order to keep competition in the supply market when all the other retailers are accepting lower prices from a potentially emergent monopolist supplier—justifies competitor standing in exclusive dealing cases. NicSand, however, did not raise this argument in the district court, and accordingly it is waived.

The alleged problem, at any rate, is a mirage. If all that one can say about a supplier is that it has offered lower prices (though not predatory prices) to a series of retailers and that the existing monopolist refuses to match those prices, a retailer would have far more questions to answer for refusing, than for accepting, the better deal. The entities with power in this market by the terms of NicSand's complaint were not the suppliers but the national retailers. It was these retailers after all who initially demanded exclusivity in the market for automotive sandpaper, only reviewing their choice of a single supplier once a year. That they have now signed longer exclusive agreements for much better prices not only does not establish a market failure but also shows the retailers' bargaining authority at work, to say nothing of adherence to their duties to consumers and shareholders. Why not enter a multi-year contract for a steep discount on the prices NicSand was charging? That helps the retailers and bodes well for consumers to boot. *See Indeck*, 250 F.3d at 977 ("No allegation in the complaint indicates in any manner whatsoever how [the customer] itself was harmed or how other customers . . . suffered by agreeing to [an exclusive] agreement with a lower bidder for such [product]."); *see also Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 872 (6th Cir. 2007) ("[I]f a higher discount is realistically and practically available, why would a reasonable purchaser *not* take advantage of the best possible price?"); *cf.* Adam Smith, An Inquiry into the Nature and Causes of the Wealth of Nations 201 (1838) ("[I]t always is, and must be, the interest of the great body of the people, to buy whatever they want of those who sell it cheapest.").

What we have said here does not mean that a potential competitor may never bring an antitrust claim for exclusive dealing. Had the large retailers and 3M conspired to eliminate NicSand from the market, that would be another matter. And should 3M use these contracts and its current market dominance to establish unreasonable barriers to entry in the future, a potential competitor might have a legitimate antitrust claim. Nor is this to say that the future competitiveness of the market lacks protection if 3M chooses to impose monopolist prices down the road. Aggrieved retailers would have standing to sue for treble damages if that occurred. *See Indeck*, 250 F.3d at 977 ("[A]s the direct victim of the alleged antitrust violation in this regard, [the customer] could prosecute its own cause of action should it deem the actions of [the supplier] inappropriate."). "The existence of an identifiable class of persons whose self-interest would normally motivate them to

vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [plaintiff] to perform the office of a private attorney general. Denying the [plaintiff] a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." *Associated Gen. Contractors*, 459 U.S. at 542 (footnote omitted).

But to allow this litigation to continue on these allegations is to allow one monopolist to sue a competitor for seizing its market position by charging less for its goods. NicSand took advantage of the very same exclusivity it now attacks to charge prices that made it vulnerable to 3M's offers in the first place. If 3M does the same by charging excessive prices itself, it will expose itself either to competition or to a legitimate antitrust complaint from retailers or excluded competitors. But until then, as the district court rightly concluded, NicSand has suffered no antitrust injury, and until then NicSand has no antitrust standing to bring this case.

The dissent worries that our decision will drive out all but the "omniscient [antitrust] plaintiffs that happen to know *every relevant factual detail* before the inception of litigation." Dissent at 15. That is not true, and there is no reason this decision should have any such effect. The key failing in NicSand's complaint is not that it has too few details but that it has too many. While we must accept all of a claimant's allegations as true at this stage of a case, that does not mean we must *ignore* those allegations when they defeat the claim and when they show the claimant is doing nothing more than invoking the antitrust laws to protect a competitor, not competition. *See Brunswick*, 429 U.S. at 488. In considerable detail, NicSand's amended complaint explained the market for do-it-yourself automotive sandpaper, *see* Am. Compl. ¶¶ 25, 46, 47, 48, 51, explained that the relevant retailers demanded exclusivity by refusing to stock more than one brand of the sandpaper at a time, *see id.* ¶ 47, explained that the relevant retailers had "de facto" one-year exclusive agreements with their suppliers, *see id.* ¶ 25, explained how all of the relevant retailers demanded up-front payments before they would switch suppliers, *see id.* ¶¶ 21, 30, 32, 35, highlighted NicSand's domination of that market under these precise conditions, *see id.* ¶ 15, detailed the 38–49% profit margins NicSand earned before 3M entered the picture (presumably to enhance NicSand's request for treble damages), *see id.* ¶¶ 22, 31, 33, 36, and spelled out the amounts of the up-front discounts that 3M offered four of the retailers, *see id.* ¶¶ 21, 30, 32, 35.

Confirming what the details in its amended complaint showed, NicSand disclaimed in its response to the Rule 12(b)(6) motion that 3M had engaged in predatory pricing or illegal tying. When "the complaint itself gives reasons" to doubt plaintiff's theory, *Bell Atl.*, 127 S. Ct. at 1972, and when later pleadings confirm those doubts, it is not our task to resuscitate the claim but to put it to rest. Nothing prevents a plaintiff from pleading itself out of court, which is all that happened here.

The dissent suggests that we can resuscitate this claim by returning to NicSand what it has given away—a predatory-pricing claim. When a party concedes that it is not bringing a claim, however, no purpose of Rule 12(b)(6) is served by overlooking the concession, and there is nothing "misleading," Dissent at 16, about reading and accepting the concession. Plainly and simply, the company acknowledged that "NicSand's Amended Complaint Is Not Premised On Predatory Pricing." JA 132; Reply Br. at 6. The plaintiff remains the master of its complaint, and when it says that it is not bringing a predatory-pricing claim, we should take it at its word.

Nor, to be fair to NicSand's counsel, was this an unusual concession to make. "[P]redatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita Elec. Indus.*, 475 U.S. at 589. Success requires not just below-cost pricing but a product market that will allow the would-be monopolist to raise prices later without the threat of new market entrants. *Id.* at 591 n.15. NicSand, in short, had ample reasons for conceding that 3M did not engage in a predatory-pricing scheme, and we should accept the concession.

The claim also cannot be revived based on the allegation that *retail* prices have risen a total of 70% since NicSand left the market. Dissent at 21. An allegation about retail prices in the context of a case against a supplier does not by itself show that the supplier engaged in anticompetitive conduct and does not show that NicSand's injury "flows from that which makes [3M's] acts unlawful." *Brunswick*, 429 U.S. at 489. *Res ipsa loquitur* is not a theory of antitrust injury, and it surely is not one after the Supreme Court's decision in *Bell Atlantic*, which set out to eliminate this kind of loose antitrust pleading. Just as in *Bell Atlantic*, where the Court held that, "[w]ithout more, parallel conduct does not suggest conspiracy," 127 S. Ct. at 1966, so here: a price increase by retailers, without more, does not suggest anticompetitive behavior by suppliers. NicSand's speculations show at most the "possibility" of an entitlement to relief, *id.*, which is just what *Bell Atlantic* said would not suffice at the pleading stage, *id.* (requiring "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief). While it is assuredly true that *Bell Atlantic* "in fact makes simpler the task before us in this case" than it was before the Supreme Court's decision, Dissent at 15, it is hard to see how that decision makes it "simpler" to rule in the *plaintiff*'s favor, as the dissent contends, *id.*

The dissent adds that "[i]t is not the appropriate response under the law to answer anticompetitive conduct with more anticompetitive conduct," suggesting that the only way NicSand could have responded to 3M's courtship of NicSand's customers over a four-year period would be to compete illegally. *Id.* at 18. But why compete illegally if, as NicSand's amended complaint says, it had 38–49% margins before 3M entered the competitive picture? Such profits surely left NicSand negotiating options over a four-year period between competing illegally and invoking the antitrust laws to preserve these margins.

The dissent expresses skepticism about our decision in *Indeck*, relying on a commentator who has questioned the decision. *See id.* at 18 n.8. But no party to this case, as we have noted, has asked us to reconsider *Indeck*. And, what is more, the central criticism leveled by the commentator concerns the statement in *Indeck* upon which the dissent principally relies, *id.* at 12—*Indeck*'s requirement that the antitrust plaintiff must show the "elimination of a superior product or a lower-cost alternative," *Indeck*, 250 F.3d at 977; *see* Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697, 747–48 (2003). As we have explained, Maj. Op. at 10, *Indeck*'s injury-to-the-market language need not detain us here because it is at most a necessary, but not a sufficient, condition for proving antitrust standing. *See Indeck*, 250 F.3d at 977 (A competitor plaintiff "must *at least* allege" injury to the market.) (emphasis added). And NicSand cannot meet another necessary requirement—that *it* suffered an antitrust injury, as opposed to the ill effects of price competition, which understandably "hurts," Dissent at 16, but which does not by itself state a cognizable antitrust claim. *See* Maj. Op. at 10. Otherwise, every time an allegedly "superior product or a lower-cost alternative" was eliminated from the market by competition, the producer of that product would have antitrust standing. That is not what *Indeck* said or did.

III.

For these reasons, we affirm.

———————————

**DISSENT**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting, joined by Judges Daughtrey, Cole, and Clay. In a recent dissent, Justice Stevens wrote nostalgically about times gone by, when most "high-speed driving took place on two-lane roads rather than on superhighways" and "when split-second judgments about the risk of passing a slow-poke in the face of oncoming traffic were routine." *Scott v. Harris*, 127 S. Ct. 1769, 1782 n.1 (2007). There is a time I reflect upon nostalgically as well — a time when monopoly was an evil targeted by Congress and guarded against by the antitrust laws of the United States. *See United States v. Von's Grocery Co.*, 384 U.S. 270, 274 (1966). Since their enactment, it has been the purpose of the federal antitrust laws to prevent the emergence of entrenched monopoly power and "to perpetuate and preserve, for its own sake and in spite of possible cost," the existence of competition in industry. *Id*. at 275 n.7 (quoting *United States v. Aluminum Co. of America*, 148 F.2d 415, 429 (2d Cir. 1945) (Hand, J.)). Today, however, the majority treats monopoly more as a board game than as an economic harm to the public. Because I cannot read the antitrust laws so narrowly, I respectfully dissent.

I.

As noted by the majority, our main concern in this case is whether NicSand has sufficiently alleged not only standing under Article III of the Constitution, but also standing under the antitrust laws. To be sure, this is a more onerous task than that faced by most civil plaintiffs. Yet this task, though challenging, should not be insurmountable. NicSand must allege more than mere economic injury, for the antitrust laws were enacted for "the protection of *competition*, not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). As the majority correctly notes, NicSand must show that the injury it suffered is "of the type the antitrust laws were intended to prevent and [] flows from that which makes defendants' acts unlawful." *Id*. at 489. That is, the injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* Despite what the majority holds today, NicSand has alleged that type of injury in this case.

"The Supreme Court has articulated certain factors to be analyzed in determining whether a plaintiff has established antitrust standing." *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000) (citing *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537-45 (1983)). Those factors include:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Id.* (citations omitted). Moreover, "[a]ll five factors must be balanced, . . . with no one factor being determinative." *Id.* (citing *Peck v. General Motors Corp*., 894 F.2d 844, 846 (6th Cir. 1990)).

This case comes before us on appeal from the district court's grant of 3M's motion to dismiss. The Supreme Court recently clarified the standard an antitrust plaintiff must satisfy at this stage, holding that an antitrust plaintiff need only provide "a short and plain statement of the claim showing that [he] is entitled to relief," so that the defendant has "fair notice of what the . . . claim

is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (citations omitted).[1] Although many commentators have intimated that *Bell Atlantic* represents a significant departure from prior law, the decision in fact makes simpler the task before us in this case.

In *Bell Atlantic*, the Court explained that "a plaintiff's obligation to provide the grounds of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1964-65 (internal quotation marks and citations omitted). Thus, the key distinction is between a bare-bones complaint asserting only the elements of a claim and a complaint asserting not only legal *elements*, but also *facts* to support those elements. Courts are well-suited to distinguish between the two. Indeed, we do so all the time when reviewing questions of fact, mixed questions of law and fact, and questions of law. It is not a controversial assertion that, while a plaintiff need not assert *detailed* facts, a plaintiff must assert *some* facts. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id*. at 1965 n.3 (citing 5 Wright & Miller § 1202, at 94, 95 (Rule 8(a) "contemplates the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it")). Thus, at the 12(b)(6) stage, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 1965 (citations omitted).

NicSand's complaint establishes a right to relief above the speculative level. Notably, NicSand has provided detailed factual allegations regarding the payments made by 3M to retailers, the years in which exclusive contracts were entered, and the approximate duration of the contracts. In particular, with regard to the duration of the exclusive contracts, NicSand has alleged a reasonable basis for inferring that they will last a few years — to wit, that the retailers told NicSand that they could not even discuss the *possibility* of doing business with NicSand for at least a few years. These factual allegations must be taken as true. Potentially relevant information may be missing from the complaint, but it is exactly this additional information that, *with the benefit of discovery*, may entitle NicSand to relief. Yet following today's decision, it is difficult to see how *any* antitrust plaintiff—short of those few omniscient plaintiffs that happen to know *every relevant factual detail* before the inception of litigation and without the benefit of discovery—will be able to overcome a motion to dismiss. *See Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 484 F.3d 865, 874 (6th Cir. 2007) ("[Plaintiff]'s claims under the [Robinson-Patman Act] may well be highly speculative, and discovery may well reveal that they are futile, but we cannot—nor can the district court—make such a determination based on the pleadings alone.").

## II.

For a number of years, NicSand had a significant share of the market for do-it-yourself retail automotive coated abrasives. NicSand sold its products through a handful of retailers and 3M was its only competitor.[2] Agreements between suppliers and retailers for these products lasted one year in the *de facto* sense because retailers did not want to change their inventories mid-year. According to NicSand's complaint, 3M pushed retailers into a series of multi-year exclusive dealing

---

[1] The Court made clear that Rule 8(a)'s liberal notice pleading standard applied to antitrust actions, *Bell Atl.*, 127 S. Ct. at 1964, and not Rule 9's "'heightened' pleading standard," *id*. at 1973 n.14.

[2] The majority characterizes 3M as a "market entrant." Maj. Op. at 14. Given that 3M, as NicSand's only competitor, had approximately 33% of the market in 1995, 3M is hardly a "market entrant." *See* Complaint ¶ 8 ("In 1995, NicSand had approximately 67% of the DIY [do-it-yourself] retail automotive coated abrasives market.").

arrangements, excluding NicSand from the market.  The terms of these exclusive agreements, and their harm to consumers by the creation of a monopoly, form the crux of this case.

The new agreements drastically changed the market and were more than simply a regurgitation of the old agreements with "slightly different terms." Maj. Op. at 14.  For one thing, 3M offered unprecedented substantial, up-front cash payments to retailers.  For another, 3M contractually guaranteed multi-year exclusivity with retailers, cutting NicSand out of the market for an extended period of time.  3M pushed retailers, including NicSand's clients, into the exclusive agreements.

First, let us focus on 3M's up-front cash payments.  Using figures provided in the complaint, we are presented with the following picture for each of the four relevant big retailers:

1.    Kmart: In 1996, NicSand's sales to Kmart were $475,000 per year and its profits were $180,000 per year.  In 1997, 3M executed a contract with Kmart which provided for a payment "in excess of $300,000."  This payment is equal to approximately 63% of NicSand's sales to Kmart and 167% of NicSand's annual profits on sales to Kmart from the prior year.[3]

2.    Advance Auto: In 1997, NicSand's sales to Advance Auto were $550,000 and its profits were $272,000.  In 1998, 3M executed a contract with Advance Auto which provided for a payment of "over $285,000."  This payment is equal to approximately 52% of NicSand's sales to Advance Auto and 105% of NicSand's annual profits on sales to Advance Auto from the prior year.

3.    CSK:  In 1997, NicSand's sales to CSK were $369,000 and its profits were $164,000.  In 1998, 3M executed a contract with CSK which provided for a payment of "over $200,000."  This payment is equal to approximately 54% of NicSand's sales to Kmart and 122% of NicSand's annual profits on sales to CSK from the prior year.

4.    AutoZone:  In 1999, NicSand's sales to AutoZone were $2,200,000 and its profits were $865,000.  In 2000 and 2001, 3M executed a contract with AutoZone which provided for a payments totaling "over $1,000,000."  The annual value of these payments ($500,000) is equal to approximately 23% of NicSand's sales to AutoZone and 58% of NicSand's annual profits on sales to AutoZone from the prior year.

Complaint ¶¶ 21, 30, 32, 35.

As these numbers demonstrate, 3M's cash payments *exceeded* NicSand's profits from the prior year for three of the retailers.  In other words, from 1997 through 2000, 3M signed agreements with three retailers, the terms of which NicSand could not possibly match on an individual basis without selling below cost — an action that may have given *3M* a cause of action under the Sherman Act.  *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 127 S. Ct. 1069, 1074 (2007).

If sales coupled with substantial up-front cash payments to those retailers would have resulted in a loss for NicSand, then it is a reasonable inference that they may have been below cost for 3M as well.  However, it is obvious that without discovery NicSand would have had no way of

---

[3]According to NicSand's complaint, in addition to providing this up-front payment, 3M *also* agreed to pay the cost of buying out Kmart's stock of NicSand do-it-yourself retail automotive coated abrasives, thus increasing the amount that 3M paid to secure Kmart's exclusive business.  Complaint ¶ 27.  Although buying out a competitor's stock was the traditional practice during annual line reviews, it is unclear from the complaint whether 3M also bought out NicSand's remaining stock from the other three big-box retailers when it obtained its multi-year exclusive dealing agreements with them.

knowing with certainty 3M's production or other overhead costs. It is telling that, in its memorandum in support of its motion to dismiss, 3M noted that NicSand had made "no allegation regarding how [NicSand] purports to measure 3M's costs." JA 83. This is the very purpose of discovery in a civil case. It simply cannot be that a business must know everything about its competitors before bringing suit in an antitrust case. After all, a business that knows everything about its competitors is likely to dominate them, rather than fall prey to them, as NicSand did here.

The majority is quick to point out that "NicSand concedes that 3M did not engage in any form of predatory pricing." Maj. Op. at 12 (citing JA 132 and Reply Br. 6). This assertion is misleading. In saying that its complaint is not based on "predatory pricing," NicSand is simply stating that 3M's conduct is not premised on the type of conduct typically referred to as "predatory pricing," that is, the *pricing* of an individual item below the cost of its production. *Cf.* Black's Law Dictionary 1215 8th ed. 2004 (defining "predatory pricing" as "[u]nlawful below-cost pricing intended to eliminate specific competitors and reduce overall competition."). In other words, NicSand's allegations do not pertain to the *price terms* offered by 3M but rather to the unprecedented and unusually large up-front cash payments used by 3M to secure exclusive-dealing agreements. JA 132-134 & n.10. While NicSand did not use the magic words "predatory pricing" in its complaint, the allegations that 3M charged competitive prices and offered substantial, up-front payments, negating any possible profits, amounts to the same thing. Thus, the conduct alleged by NicSand, a form of predatory *pricing*, is still predatory conduct that hurts, and in this case eliminated, competition. *See id.* at 133 n.10. As NicSand aptly notes in its response to 3M's motion to dismiss, "[t]he point is not that 3M's supracompetitive payments crossed the predatory pricing line, but that they were part and parcel of a different, but equally insidious, form of predatory, anticompetitive, conduct." *Id.*

In fact, the majority, when defending the multi-year terms of 3M's agreements, seems to acknowledge that 3M effectively sold below cost. The majority explains that it would be easier for a supplier such as 3M to gain a foothold in the market "when it is given several years, rather than just one, to recoup this investment." Maj. Op. at 14. The "investment" that 3M would "recoup" is the loss it took by offering substantial, up-front payments. Those payments, upon further discovery, might be revealed to have effectively amounted to below-cost pricing. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986) ("The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain.").

Perhaps recognizing that NicSand would have lost money had it offered matching lump-sum payments to three out of the four retailers, 3M asks this court to compare NicSand's aggregate profits from four individual retailers in four individual years (Kmart in 1996, Advance Auto in 1997, CSK in 1997, and AutoZone in 1999) to the aggregate of 3M's payments over a later four-year period (1997-2000). By aggregating in this manner, 3M attempts to gloss over the fact that NicSand would have had to have sold below cost to three out of the four retailers. This approach asks us to read NicSand's complaint in the light most favorable to *3M*. Nevertheless, even under that improper approach, there is a small margin for error. According to 3M, the aggregate data for NicSand would yield a profit margin of merely five percent — a meager profit indeed.[4]

The poor quality of the data at issue makes this potential five percent profit margin hinge on several levels of assumptions, which could be—or could not be—confirmed through discovery. To

---

[4] 3M arrives at this profit margin by first adding NicSand's annual sales and profits from each of the four retailers in the four individual years, which amounts to $3,594,000 in sales and $1,481,000 in profits. 3M then takes the total annual value of its four lump-sum payments made in the individual years to be $1,285,000 (3M divides its payment to AutoZone in half). 3M then subtracts $1,285,000 from $1,481,000 to arrive at a total profit of $196,000, which, when divided by sales of $3,594,000, yields a profit margin of approximately 5%. Appellee Supp. Br. at 8-9 n.4.

be sure, on this record, we have little choice but to compare profit data for NicSand's last year with a particular retailer to the amount of 3M's up-front payment to that retailer in the subsequent year. That is the best we can do because NicSand was eliminated from the market, and therefore was not around long enough to develop its own profit data in the later years. But when we aggregate this data, we are forced to use 3M's *assumptions* about how well NicSand might have performed in the market with respect to individual retailers in years after 3M secured contracts with them, and to compare those *assumptions* with the actual payments made by 3M. Moreover, the data fails to account either for inflation or for any line of credit NicSand may have had, such that the estimated profit margin may contain significant inaccuracy. And, the data also fails to account for the fact that these agreements were made in secret, thereby depriving NicSand of an opportunity to compete by offering comparable deals. In order to avoid elimination from the market, NicSand not only would have had to match 3M's payments, but also presumably would have had to pay the cost of inducing a retailer to breach its exclusive contract with 3M. In contrast, 3M did not have to bear that cost because the exclusivity of the prior agreements was merely *de facto* — retailers could switch at any time without penalty.

Given the multiple levels of uncertainty incorporated into 3M's analysis, it is impossible to tell how accurate or solid that predicted profit margin is, or whether, indeed, NicSand would have lost money in the aggregate. That realization is more troubling in light of the obviously sequential conduct that took place in this case. 3M acquired three retailers over a series of years, each time employing allegedly anticompetitive agreements. Only in the final year, when NicSand was already on its last legs, was 3M able to recoup its losses on its deals with the other three retailers by securing a more favorable agreement with AutoZone. Given our duty to read the facts in the light most favorable to NicSand in this case, it is simply impossible to conclude that these agreements were not anticompetitive.[5]

In addition to downplaying the importance of 3M's substantial up-front payments, the majority is also untroubled by the exclusivity of the agreements or the agreements' multi-year terms. The majority claims that the type of exclusivity demanded by 3M is the same type of exclusivity that retailers demanded prior to 3M's market dominance. But according to NicSand's complaint, under the retailers' pre-1997 rules, exclusivity lasted no longer than the completion of one purchase order. Retailers were free to switch suppliers from one purchase order to the next. *See* Complaint ¶ 25 ("[R]etailers would *typically* not change suppliers other than at the time of their annual line review." (Emphasis added)). A retailer carrying 3M's products was free to suddenly solicit NicSand's line of products. Or alternatively, a retailer was free to do what Pep Boys did — carry both suppliers' lines simultaneously. Although it appears that in reality, retailers opted to stick with one supplier for a full year, these agreements were, at most, "*de facto*" exclusive in the sense that once a retailer decided to receive its inventory from one supplier, it was *unlikely* to switch suppliers for one year. Thus, while an individual retailer perhaps wisely chose to keep one supplier's product on its shelves for a period of one year, that retailer was simply not contractually bound to do so. There were no *actual* "exclusive dealing agreements" prior to 1997. Rather, there were four retailers choosing an economically reasonable course of business, and two suppliers competing fairly for that business. And even so, agreements with suppliers were reconsidered every year during annual line reviews.[6]

---

[5]3M also asks us to make another profits calculation by spreading each of the four payments and profits over two years, which would yield a higher profit margin of 16%. Appellee Supp. Br. at 8-9 n.4. The majority goes even farther, claiming that under another unspecified methodology, NicSand still could have had profit margins of 17%-39%. Maj. Op. at 15. For the reasons already stated above, I believe that in light of the flaws already inherent in the methodology discussed above, any such calculations would be excessively speculative at best and would require us to misconstrue NicSand's complaint in 3M's favor.

[6]Nor does the complaint state that the retailers were contemplating multi-year contracts or enacting any change in the market. All changes in the market were a direct result of 3M's conduct.

Under this system, although NicSand may have been the more successful competitor in the market for a time, it alleges its success was owed to its "superior marketing, superior packing, innovation, and superior value," *id*. ¶ 11, not to anticompetitive practices.

Contrary to the majority's averments, NicSand should not have sought multi-year arrangements with retailers like 3M did. It is not the appropriate response under the law to answer anticompetitive conduct with more anticompetitive conduct. Moreover, in a battle for a monopoly between NicSand and 3M, it is hard to imagine how NicSand could have prevailed. Given the choice between a certain amount of money in one up-front payment or in installments over several years, any reasonable retailer would have chosen the former. That is simply time-value-of-money economics. 3M is a manufacturing powerhouse that obviously had the ability to subsidize its operations in the do-it-yourself-retail-automotive-coated-abrasives market with revenues from other sectors.[7] NicSand, in contrast, may not have had the capital to match 3M's substantial up-front payments and may not have been able to do so without selling below cost. The majority opinion lacks a certain real-world understanding of the relative positions of the two companies at issue in this case.

In sum, under a plausible reading of NicSand's complaint, 3M did the following. First, it offered retailers unprecedented and substantial up-front payments — payments that may have, in effect, been a form of below-cost pricing. 3M executed contracts with retailers that gave 3M exclusivity for several years in order to guarantee 3M time to recoup any losses. This multi-year exclusivity, when paired with its agreements with other retailers, also gave 3M a large enough share of the market such that its sole competitor, NicSand, would no longer be able to stay afloat. These agreements guaranteed 3M a monopoly in the do-it-yourself-retail-automotive-coated-abrasives market. NicSand's allegations of 3M's anticompetitive conduct are further bolstered by the fact that NicSand was forced into bankruptcy, *id*. ¶ 43, 3M now controls almost 100% of the market share, *id*. ¶ 67, and prices for these products have risen by 70% since NicSand left the market, *id*. ¶ 63. As discussed below, with this monopoly now established, 3M no longer has to worry about keeping a superior and diverse product line or keeping its prices low.

### III.

In *Indeck*, we explained that in a case where a competitor sues another competitor for an alleged antitrust violation, the plaintiff "must at least allege that [its] exclusion . . . from the marketplace results in the elimination of a superior product or a lower-cost alternative." 250 F.3d at 977.[8] Since this case comes before us at the 12(b)(6) stage, we must focus on NicSand's particular allegations of harm to the market. To do so, we need look only to NicSand's complaint, which alleges, in pertinent part:

> 11. [The growth in NicSand's market share] between 1987 and 2000 in DIY retail automotive coated abrasives was fueled primarily by NicSand's superior marketing, superior packaging, innovation, and superior value. NicSand acquired and retained

---

[7] Any good lawyer knows the value of Post-It Notes and Tabs. *See, e.g.*, *LePage's, Inc. v. 3M*, 324 F.3d 141, 157 (3d Cir. 2003)(finding ample evidence that 3M used exclusive agreements to entrench its monopoly over transparent tape); *see also N.J. Wood Finishing Co. v. Minn. Mining & Mfg. Co.*, 332 F.2d 346, 348 (3d Cir. 1964) ("3M [is] a highly diversified company, manufacturing and selling a number of product lines and segments.")

[8] One commentator has noted that the continuing validity of *Indeck* as a correct application of the Supreme Court's five-factor test has been called into question by later cases. *See* Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L. J. 697, 748 n.184 (2002-2003) ("In . . . *Conwood* [*Co. v. United States Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)], the court alluded to no requirement that the plaintiff's snuff had to taste better, or cost less, than the defendant monopolist's snuff."); *see also id*. at 737-43, 747-48 (criticizing the Sixth Circuit's precedent on the question of what a competitor must establish to show antitrust injury).

its share of that market by offering better value than its competitors, providing on-time delivery, instituting innovative programs designed to assist DIY retailers in increasing their volume and profitability in the DIY retail automotive coated abrasives market, offering more products in less space, offering flexible payment terms, packaging each of its products in a manner consistent with that product's market orientation, and, creating new specialty products at the request of customers.

63. As a result of 3M's attempted monopolization and/or monopolization of the market for DIY retail automotive coated abrasives, consumer prices for DIY retail automotive coated abrasives have risen significantly, in some cases, as much as 70%.

64. As a result of 3M's attempted monopolization and/or monopolization of the market for DIY retail automotive coated abrasives, the number of available DIY retail automotive coated abrasives products available for purchase by consumers has dropped by as much as half, from approximately eighty to approximately forty.

69. Consumers have suffered as a result of 3M's unlawful monopolization of the DIY retail automotive coated abrasives market, as prices have increased and selection has decreased substantially since 3M established its monopoly.

Under a fair reading of the quoted paragraphs, NicSand has met *Indeck*'s requirements. First, it has alleged that its products were superior to 3M's products. Given that "superior" is a comparative term and that 3M was NicSand's only competitor during the relevant period, *see* Complaint ¶ 12 ("NicSand's only competitor in the DIY retail automotive coated abrasives market during the period 1987 to 2000 was 3M."), NicSand's complaint could only have been alleging that its products were superior to 3M's. NicSand claimed superiority in several senses: "superior marketing, superior packing, innovation, and superior value." *Id*. ¶ 11; *see also id*. ¶ 58 ("3M did not offer a superior product, superior pricing, or superior service.").

The majority complains, however, that what NicSand offers us is simply "an unelaborated claim that it provides better service than its competitors." Maj. Op. at 21. Neither 12(b)(6) nor *Indeck* requires much, if any, further elaboration. Nevertheless, NicSand does in fact *explain* what it means, noting that it provided better value, on-time delivery, and "innovative programs designed to assist DIY retailers in increasing their volume and profitability in the DIY retail automotive coated abrasives market, offering more products in less space." Complaint ¶ 11. NicSand also touts its flexible payment terms, packaging, and perhaps most importantly, its "creat[ion of] new specialty products at the request of customers." *Id*. In addition to the allegation of superior products and service, NicSand also alleges that since 3M established its monopoly, the selection of products has decreased substantially. *Id*. ¶ 64, 69. Thus, NicSand has alleged a decrease not only in product quality, but also in market diversity. While NicSand certainly could have alleged that its sandpaper had a better coefficient of friction than 3M's, or something else to similar effect, NicSand does not need to supply such detailed factual information *at the pleading stage*, without the benefit of discovery.

NicSand has also alleged that since its departure from the market, "consumer prices for DIY retail automotive coated abrasives have risen significantly, in some cases, as much as 70%." *Id*. ¶ 63; *see also id*. ¶ 69 ("[P]rices have increased . . . since 3M established its monopoly."). NicSand has sufficiently alleged that its exclusion has "result[ed] in the elimination of . . . a lower-cost alternative," which in turn " indicat[es] that *competition* itself was harmed by" 3M's conduct. *Indeck*, 250 F.3d at 977 (emphasis in original). In other words, as a result of 3M eliminating its only competitor through a series of exclusive dealing contracts, competition was lessened, and prices increased as a result. And indeed, price increases of this magnitude certainly injure consumers. This type of problem goes to the heart of what the antitrust laws were designed to prevent. *Cf. Reiter v.*

*Sonotone Corp.*, 442 U.S. 330, 342 (1979) ("The essence of the antitrust laws is to ensure fair price competition in an open market.").

Although the majority dispenses with these factual allegations by concluding that NicSand has not alleged that *3M* raised its prices, Maj. Op. at 6, it is a reasonable inference that at least some portion of the 70% price increase could be due to 3M's monopoly. The idea that the retailers might be passing on some additional cost from 3M should not be controversial. *Cf. Northwest Airlines v. County of Kent*, 510 U.S. 355, 376 (1994) (Thomas, J., dissenting) ("Any cost an airline bears is in some sense an 'indirect' charge 'on persons traveling in air commerce,' because the airline ultimately will pass that cost on to consumers in the form of higher ticket prices."); *Acadia Motors v. Ford Motor Co.*, 44 F.3d 1050, 1056 (1st Cir. 1995) ("[I]t is quite commonplace for manufacturers and other regulated entities to pass on to retailers and consumers their costs of complying with regulatory statutes."). Yet the majority believes this is not good enough, taking aim at NicSand for not specifying that the apparent increase in prices was due to actions by 3M and not by retailers. To dismiss this case on the pleadings on that basis defeats the whole point of notice pleading. When retailers raise prices, they do not include on their price tags a footnote outlining their reasons. At this point, before discovery, all NicSand can go by is what it sees in stores, and its allegations based on those observations raise a reasonable inference that 3M has used its monopoly power to increase prices. Nothing more should be required.

The majority apparently believes that NicSand has merely alleged that 3M's conduct caused the market to become less diversified, and argues that *Indeck* stands for the proposition that less diversity in the marketplace, standing alone, is insufficient to establish antitrust standing. Maj. Op. at 21. As discussed above, that is *not* all NicSand alleged in its complaint. However, assuming arguendo that all NicSand has alleged is that the market has become less diverse, I would part ways with the majority on its result because this "less diverse" market is now clearly a *monopoly* and the facts, as alleged by NicSand, show that the special dangers inherent in monopoly power may exist in this case. *Von's Grocery*, 384 U.S. at 275, 277 & n.7.

Antitrust cases focus on exclusion from the relevant market, and the relevant market usually has characteristics that pertain to the case at hand. Diversity is valuable in any marketplace, but more so in some than in others. In *Indeck*, the relevant market was one for the commodity of electric power. The relevant question about the diversity of the market was whether the exclusion of thermal power from the market, in and of itself, was enough to establish antitrust standing. The *Indeck* court apparently believed that it was not. However, the electric power market is entirely different from the market at issue in this case. In most markets for electric power, it is not uncommon—given the substantial start-up, maintenance, and regulatory costs of operating a power plant—for there to exist long-term exclusive agreements with one producer. *Cf. Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 334 (1961) (upholding a 20-year requirements contract between a public utility and a coal mining company, and noting that "at least in the case of public utilities the assurance of a steady and ample supply of fuel is necessary in the public interest."). But long-term, exclusive contracts are obviously less essential in a retail-based market that supplies a product to consumers that is hardly a necessary commodity, the production of which does not require as substantial an investment of start-up capital as does a power plant, and that, as the majority quips, "does not take any ingenuity to make." Maj. Op. at 12. And, since prices of electricity are usually regulated in some fashion by a governmental body, there is less risk of price gouging in those markets. *Cf. Hallie v. Eau Claire*, 471 U.S. 34, 47 (1985) ("[T]here is little or no danger that [a city] is involved in a *private* price-fixing arrangement."). Moreover, *Indeck* focused on diversity in the *source* of electric power. To the end user—that is, the consumer—a difference in source is not terribly significant. Most consumers merely want reliable and affordable energy.

However, in the retail market, a 50% reduction in the variety of products is undoubtedly meaningful. Different consumers desire different products for different needs. In a sense, diversity

of products in the market for retail goods is a proxy for preserving the ability of consumers to choose products that they deem superior or that cost less. In other words, to say that a reduction in diversity does not reflect a reduction in the superiority of products or in the number of lower-cost alternatives is to ignore the impact of consumers' preferences. Those consumers who relied on the forty products that have since disappeared from shelves may no longer have products that meet their goals for the cost they are willing to pay (especially given the 70% increase in price since NicSand was forced out of the market). This court, in essence, has decided on its own, without the benefit of discovery, that consumers should not be able to choose what may be a "superior product." This court cannot make that decision, at least not at the motion-to-dismiss stage.[9]

The majority's contention that there is no collective action problem in this case is also problematical. It is quite unlikely that in this market, retailers are going to sue over a line of sandpaper products, rather than simply pass the cost to consumers. It is a plausible inference from NicSand's complaint that this is what the retailers have done in this case, since retail prices allegedly have risen seventy percent since NicSand's exclusion from the market. Further, NicSand has suffered substantial injury in this case, whereas the retailers, given the small size of the relevant market, have suffered only marginal injury relative to their entire sales portfolios. Thus, they have less motivation to bring suit against 3M, given litigation costs and the risk of hurting their relationships with 3M, a company with substantial market presence across numerous product lines. As the panel majority aptly noted:

> the magnitude of the discounts (measured as a percentage of NicSand's sales) declined as 3M locked up a progressively larger share of the distribution market. That is, as 3M seemed more likely to attain a monopoly position, the downstream distributors demanded progressively smaller discounts—perhaps because they expected NicSand to exit the market and hoped to assure themselves of some discount (and not be the only one of the distributors not to have done so) before none was available.

---

**9**Neither the *Indeck* panel nor the majority in this case addressed our precedent's "necessary predicate" test for antitrust standing. I therefore will not address it in detail. I pause to note only that I believe the test is satisfied in this case. The "necessary predicate" test was most recently examined by this court in *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896 (6th Cir. 2003). There, plaintiffs, purchasers of a particular heart medication, sued the manufacturer of the brand-name version of the drug and a manufacturer of a generic version of the drug, alleging that the former agreed to pay the latter $40 million per year to delay introduction of its generic version. Defendants made an argument similar to the one that 3M makes here: that plaintiffs failed to satisfy the necessary predicate test because even in the absence of the contract, the generic manufacturer *could have* legally and unilaterally delayed introduction of the drug into the market. *Id.* at 912. The *In re Cardizem* court rejected this logic, explaining that in the prior cases, "complaints were dismissed for failure to allege antitrust injury because each of the defendants had taken an action that it was lawfully entitled to take, independent of the alleged antitrust violation, which was the actual, indisputable, and sole cause of the plaintiff's injury." *Id.* at 914. The court stated that "[t]he fact that [defendant] could have unilaterally, and legally, decided not to bring its generic product to a manifestly profitable market ha[d] no relevance in assessing whether the plaintiffs adequately alleged that the antitrust violation was the necessary predicate for their injury." *Id.* at 915. The court further observed:

> [D]efendants' position, if adopted, risks undermining a basic premise of antitrust law[:] . . . [that] in many instances, an otherwise legal action — *e.g.* setting a price — becomes illegal if it is pursuant to an agreement with a competitor. Under the defendants' view, such an action would never cause antitrust injury because a defendant *could* have unilaterally and legally set the same price.

*Id.* at 195 n.19.

The only issue in this case is whether the exclusive agreements at issue were anticompetitive and whether they injured the market under the relevant precedent. Because they *were* and they *did*, there is nothing else at issue in this case that suggests that 3M took any *legal* actions that were "the actual, indisputable, and sole cause of [NicSand]'s injury." *Id.* at 914. Accordingly, the "necessary predicate" test is satisfied here.

*NicSand, Inc. v. 3M Co.*, 457 F.3d 534, 546 n.8 (6th Cir. 2006), *vacated by* 2006 U.S. App. LEXIS 32342 (6th Cir. Nov. 22, 2006) (en banc).  In essence, a collective action problem arose in this case because each retailer's choice to get on 3M's bandwagon was profitable to that retailer in the short-term and did not account for the potential long-term cost of a monopoly in the relevant market.

## IV.

The majority seeks to characterize this case as one in which one company that had long prospered in a particular niche market became lazy and fell victim to a more vigorous competitor that simply played the game of business more effectively.  While NicSand may have once been the dominant competitor, that former status can neither legalize 3M's anticompetitive business practices nor make 3M immune from antitrust suit.  Yes, NicSand was 3M's competitor, and yes, it obviously fell prey to 3M's tactics.  However, 3M now holds a monopoly over the market, products have been eliminated and prices have correspondingly risen by seventy percent.  The question here is whether the tactics 3M employed to attain that status were legal and whether NicSand is an adequate representative of the market's interests in this suit.  Contrary to the majority's contentions, at this stage of the case, it is impossible to conclude that NicSand has failed to meet its burden.  The dangers of monopoly are well-recognized in our law, *see Von's Grocery Co.*, 384 U.S. at 274-75, and I believe the majority has improperly turned a blind eye to them in this case.

Accordingly, I respectfully dissent.